**Cora McRAE, Individually and on behalf of all others similarly situated, et al., Plaintiffs,**

v.

**F. David MATHEWS, Secretary, United States Department of Health, Education and Welfare, Defendant.**

**NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Plaintiff,**

v.

**F. David MATHEWS, Secretary, Department of Health, Education and Welfare, Defendant.**

Nos. 76–C–1804, 76–C–1805.

United States District Court,
E. D. New York.

Oct. 22, 1976.

Stay Denied Nov. 8, 1976.
See 97 S.Ct. 347.

Harriet F. Pilpel, Frederic S. Nathan, Lawrence Vogel, and Eve W. Paul, New York City (Greenbaum, Wolff & Ernst, New York City, of counsel), for plaintiff Planned Parenthood.

Sylvia A. Law, Rhonda Copelon, and Nancy Stearns, New York City (Center for Constitutional Rights); Jill Laurie Goodman, Brooklyn, N. Y., Ellen Leitzer, Decatur, Ga., Judith Meurs and Nadine Taub, Newark, N. J. (American Civil Liberties Union), for plaintiffs McRae and Teran, individually and on behalf of others similarly situated.

Ellen K. Sawyer, Brooklyn, N. Y., and James G. Greilsheimer, New York City (W. Bernard Richland, Corp. Counsel, New York City, of counsel), for the New York City Health and Hospitals Corp.

Lewis F. Tesser, New York City (David G. Trager, U. S. Atty., Brooklyn, N. Y., of counsel), for the Secretary.

Janet Benshoof, New York City, for National Medical Assn., The National Assn. of

Social Workers, The American Public Health Assn., National Organization for Women, Legal Defense Fund, Planned Parenthood Federation of America, Inc., and Assn. of Planned Parenthood Physicians, as amici curiae.

Claire Biunno, New York City, for American Ethical Union, American Humanist Association, Americans United for Separation of Church and State, Board of Church and Society—United Methodist Church, Catholics for a Free Choice, Church of the Brethren, National Federation of Temple Sisterhoods, National Ministries—American Baptist Churches in the United States of America, National Women's Conference of the American Ethical Union, Office for Church in Society—United Church of Christ, Union of American Hebrew Congregations, Unitarian Universalist Women's Federation, The Young Women's Christian Association, United Presbyterian Church in the U. S. A.

Leonard F. Manning, New York City (Gerald E. Bodell, and Bodell & Magovern, New York City, of counsel), for James F. Buckley, Jesse A. Helms and Henry J. Hyde, on the petition to intervene.

A. Lawrence Washburn, Jr. (Bodell & Magovern, New York City, of counsel), for Isabelle M. Pernicone, on the Petition for appointment as guardian ad litem for unborn children as a class affected by the outcome of the suit.

## MEMORANDUM AND ORDER

DOOLING, District Judge.

By these actions plaintiffs seek to invalidate Section 209 of Public Law 94–439, the Departments of Labor and Health, Education, and Welfare Appropriation Act, 1977; that section became law on September 30, 1976. It provides that:

> None of the funds contained in this Act shall be used to perform abortions except when the life of the mother would be endangered if the fetus were carried to term.

The Act is the general appropriation Act for the fiscal year ending September 30, 1977, and it includes provision for Medicaid reimbursement.

The part of the Conference Report on the bill dealing with Section 209 is quoted as saying (*inter alia*)

> It is not our intent to preclude payments for abortions when the life of the woman is clearly endangered . . . if the pregnancy were carried to term. Nor is it the intent of the conferees to prohibit medical procedures necessary for the termination of an ectopic pregnancy or the treatment of rape or incest victims . .
>
> \* \* ,\* \* \* \*
>
> The Congress is aware that there are three cases related to this issue to be heard by the Supreme Court this fall, and wishes to make clear that the Congress in its action on this particular appropriations bill does not intend to prejudge any constitutional questions involved in those cases.

It has been decided in this state that Medicaid reimbursement may not constitutionally be denied for "elective abortions" (*Klein v. Nassau County Medical Center*, E.D.N.Y. 1972, 1976, 347 F.Supp. 496, 409 F.Supp. 731), and it has been decided in this circuit that a state cannot constitutionally deny medical assistance to indigent women seeking "elective abortions" in the first trimester of pregnancy (*Roe v. Norton*, D.Conn. 1975, 408 F.Supp. 660). Both decisions arose specifically in the Medicaid context under state plans adopted under 42 U.S.C. 1396a. Both are on appeal in the Supreme Court.

The parties agree that there is no material controversy about the facts. Plaintiffs show the following facts:

Plaintiff Cora McRae is a citizen and resident of New York in the first trimester of pregnancy and in consultation with a physician has decided to terminate her pregnancy. She is without means and relies on Medicaid for all medical care. Plaintiff Planned Parenthood is a non-profit New York corporation which provides family planning services and also, at state-licensed clinics, provides about 300 first tri-

mester abortions each month for patients eligible for Medicaid. In the first six months of 1976 it provided 6,253 abortions of which 1,777 were for Medicaid patients for which billings were about $260,000. In 1975 it provided 2,202 abortions for Medicaid patients and received $288,636 in Medicaid reimbursement. Plaintiff Irwin B. Teran is a licensed physician who specializes in obstetrics and gynecology. About half of the patients he treats at his Bushwick office are Medicaid eligible and about one-quarter of the income of that office is derived from Medicaid reimbursements for first and second trimester abortions; he performs about three Medicaid abortions a week. (The Medicaid reimbursement to Dr. Teran is $100 for each abortion, a sum much below the usual fee for such an operation.)

The individual plaintiffs and Planned Parenthood are each representative of many others similarly situated and who are similarly affected by the prohibition of the new enactment.

The New York City Health and Hospitals Corporation is a public benefit corporation charged with the responsibility for providing comprehensive health and medical services for the people of New York City and with operating sixteen municipal hospitals, twelve of which perform abortions. The most recent statistics compiled show that in 1974 the municipal hospital system provided 10,324 abortions for Medicaid eligible persons. The Hospitals Corporation anticipates, reasonably, that if federal funding is denied, private physicians, voluntary hospitals and clinics will cease providing abortion service for those generally eligible for Medicaid because of apprehension that the withdrawal of federal funding will result in their not being reimbursed. The consequence will be a great increase in the demand on the municipal hospitals for abortion services. Denial of federal funding will in turn diminish the municipal hospitals' capacity to render adequate medical care to their patients and in particular to indigent women, lawfully seeking to terminate pregnancies. The municipal hospitals

are not free under the law as they understand it to deny such abortions.

The municipal hospitals provide over half of all the ambulatory-patient care and emergency room visits provided in New York City and provide about 40 percent of all inpatient care furnished in the City. They provide annually three million days of inpatient care and nine million ambulatory-patient and emergency room visits. The municipal hospitals have provided elective abortions since July 1, 1970, following the enactment in its present form of Penal Law § 125.05. In the period before the *Wade* and *Bolton* decisions, from July 1, 1970 to January 1, 1973, the municipal hospitals performed 68,024 abortions for New York City residents; of these 33,914 were for patients who were eligible for Medicaid. In the same period the voluntary and proprietary hospitals and the clinics performed 112,672 abortions for city residents, of whom about 32,169 were Medicaid eligibles. In the two years following the Supreme Court decisions, the municipal hospitals performed 42,005 abortions for city residents, of whom half were Medicaid eligibles; in the same period the voluntary and proprietary hospitals and the clinics performed 169,799 abortions for city residents, of whom 35 percent were Medicaid eligibles.

New York City Department of Health Statistics record 830,780 abortions performed in the six years 1970–1975 of which 405,742 were performed for residents. (The number performed for nonresidents is still substantial but only a fraction of what it was in 1971 and 1972.) In the years 1970–1974 abortions performed in New York City for its residents were for the most part performed in the first trimester. In 1972–1974 over 83 percent were performed in the first trimester; in 1971 the percentage was 79 percent. In the same years over half the abortions were performed for non-whites and Puerto Ricans. Incomplete 1975 statistics record 81,426 abortions for residents of the city, 16,478 being performed in municipal facilities about half of which were performed for Medicaid eligibles, representing Medicaid reimbursement of $2,306,920.

The New York Department of Social Services through its Commissioner has taken the position throughout the litigation in *Klein v. Nassau County Medical Center, supra,* that the State Medicaid plan does not provide reimbursement for any abortions except those which are "medically necessary." The Commissioner has appealed the decision in the *Klein* case requiring reimbursement to providers who perform abortions during the first twenty-four weeks from the commencement of pregnancy regardless of whether such abortions are medically necessary or not. The Commissioner's Administrative Letter 76 ADM–92 of September 3, 1976, directed local Social Service Commissioners to allow claims for legal abortions performed for Medicaid eligibles by qualified providers, and that

> . . . usual billing procedures shall be followed, and any bill for an abortion should be handled as a bill for a surgical procedure.

> \*    \*    \*    \*    \*    \*

> It should again be noted that abortions are not considered family planning procedures and therefore may not be claimed at the 90% Federal and 5% State reimbursement levels. They should be claimed at the usual reimbursement level of 50% Federal and 25% State share.

Title XIX of the Social Security Act was enacted in July 1965 for the purpose of "enabling each State, as far as practicable under the conditions in such State, to furnish . . . medical assistance on behalf of families with dependent children," and it authorized the annual appropriation for each fiscal year of a sum "sufficient to carry out the purposes" of Title XIX; sums made available under the authorization "shall be used for making payments to States which have submitted, and had approved by the Secretary of Health, Education and Welfare, State plans for medical assistance." 42 U.S.C. 1396. Title XIX requires state plans to include a number of very specific provisions as a condition to approval by the Secretary (42 U.S.C. § 1396a(a), (b)), and requires State financial participation equal, in New York's case, to 50 percent, matching the "Federal Medical Assistance percentage" of 50 percent—the statutory minimum for the federal participation. 42 U.S.C. §§ 1396a(a)(2), 1396d(b).

Section 1396h makes it a federal misdemeanor to make a false statement in an application for a payment under a State plan approved under Title XIX or to make or cause to be made a false statement of a material fact for use in determining rights to a payment under an approved State plan. It is also made a misdemeanor to solicit, offer or receive a kickback or bribe or a rebate of fee in connection with furnishing a service "to an individual for which payment is or may be made in whole or in part out of Federal funds under a State plan approved under" Title XIX.

New York in 1966 adopted Title 11 of the New York Social Services Law (Sections 363–369) to provide medical assistance for needy persons in pursuit of the state's goal of making available to everyone, regardless of race, age, national origin or economic standing, uniform, high-quality medical care (Section 363). Title 11 was drafted in conformity with Title XIX of the federal act and Section 363–a required submission of the state plan to the Department of Health, Education and Welfare for approval. It was approved.

The Secretary contends first, that plaintiffs will suffer no harm from the enactment because the state under its law and, perhaps, under federal constitutional imperatives must continue to reimburse providers who perform lawful elective abortions. Cases, of which *Klein v. Nassau County Medical Center, supra,* and *Roe v. Norton, supra,* are typical, the argument continues, have required the states to grant such reimbursement under state law and regulations that conform to the requirements of Title XIX of the Social Security Act, and the state has complied. That the state may not obtain reimbursement does not, the Secretary asserts, discharge the state's responsibility under the State constitution (Article XVII, Section 1) to provide for the aid, care and support of the needy, a responsibility legislatively imposed on the

public welfare districts which must discharge that responsibility even if the state is not required to reimburse them. *Jones v. Berman*, 1975, 37 N.Y.2d 42, 54–55, 371 N.Y.S.2d 422, 332 N.E.2d 303.

The argument overlooks the essential nature of the Medicaid legislation. The state and federal government are linked in a fiscal partnership to provide for medical assistance to the needy; the program is based on the federal initiative, and the funding is primarily federal (42 U.S.C. §§ 1396, 1396d(b)). The needy are citizens no less of the United States than of the states of their residence, and in the federal society of today the federal government is not a grantor of voluntary bonifications to the states, but a representative government discharging through state agencies its responsibilities to provide from the public revenues (the sources of which it has so largely preempted) for its own needy in the states of their residence, and with the administrative and fiscal assistance of the states. Counsel misread *Burns v. Alcala*, 1975, 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469; it says only that state plans are not required to provide assistance for the unborn children of the needy. The Court did not invalidate the regulation providing for the reimbursement of states which, like New York (*cf. Rankin v. Lavine*, 4th Dept.1975, 50 A.D.2d 1091, 376 N.Y.S.2d 355) elect to pay benefits in respect of unborn children. But these are cases dealing with statutory interpretation, not with constitutional principle nor with the measure of responsibility directly to the needy which the national government assumed when, in Title XIX of the Social Security Act, it laid down the parameters of medical assistance for the needy of the nation. The states are not the beneficiaries of Title XIX but the agencies through which the national government secures medical assistance to the needy.

It follows that withdrawal of reimbursement for elective abortions lawfully performed by licensed providers is directly injurious both to the providers and to the indigent women who seek the abortional services. The providers are denied payment, by the hand of the state, of what the government is (assuming their basic contention is constitutionally correct) obligated to pay them from the appropriation for carrying out Title XIX of the Social Security Act. The indigent women, the recipients of the medical assistance which it is the purpose of Title XIX to provide, have the interest of primary beneficiaries in the making of the payments, if their constitutional contention is correct.

The plaintiffs Planned Parenthood and Teran say that they will not, and the Hospitals Corporation shows that it will not long be able to, provide abortional service in the elective cases if the new enactment is valid and no federal funds are made available. It may well be that the state could find funds to assume the responsibility for making the payments, or that private charity could supply the abortional services. But that is no more than to say that if the national government unconstitutionally denies an entitlement, catastrophe need not ensue. The answer is that action if unconstitutional, is not tolerable, and is not made tolerable by the consideration that others may make good the harms inflicted by the unconstitutional default. The manifest fact is that Section 209 is calculated to stop the provision of abortional services from public funds; it is not calculated to shift the burden of providing this medical assistance to the states. *Cf. Shapiro v. Thompson*, 1968, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600.

That the plaintiff providers have "standing" to sue is plain then, from *Planned Parenthood of Missouri v. Danforth*, 1976, —— U.S. ——, 96 S.Ct. 2831, 49 L.Ed.2d 788, and *Singleton v. Wulff*, 1976, —— U.S. ——, 96 S.Ct. 2868, 49 L.Ed.2d 826. The interest of the needy women is self-evident. And *cf. Aguayo v. Richardson*, 2d Cir. 1973, 473 F.2d 1090, 1098–1101.

It is argued that the judiciary has not the power of appropriation and that to declare Section 209 invalid and order that reimbursement for elective abortions continue would amount to exercising the power of appropriation in violation of Article I, Sec-

tion 9, Clause 7, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."

Public Law 94–439 is an appropriation Act. Its enacting clause and relevant text read:

> Be it enacted . . . , That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Departments of Labor and Health, Education, and Welfare, and related agencies, for the fiscal year ending September 30, 1977, and for other purposes, namely:

\*    \*    \*    \*    \*    \*

## SOCIAL AND REHABILITATION SERVICE

### PUBLIC ASSISTANCE

For carrying out, except as otherwise provided; titles I, IV, X, XI, XIV, XVI, XIX, and XX of the Social Security Act, and the Act of July 5, 1960 (24 U.S.C., ch. 9) $18,040,850,000, of which $56,500,000 shall be for child welfare services under part B of title IV.

For making, after June 30 of the current fiscal year, payments to States under titles I, IV, X, XIV, XVI, XIX and XX, respectively, of the Social Security Act, for the last three months of the current fiscal years (except with respect to activities included in the appropriation for "work incentives"); and for making after July 31 of the current fiscal year, payments for the first quarter of the succeeding fiscal year; such sums as may be necessary, the obligations incurred and the expenditures made thereunder for payments under each of such titles to be charged to the subsequent appropriations therefor for the current or succeeding fiscal year.

In the administration of titles I, IV (other than part C thereof), X, XIV, XVI, XIX, and XX, respectively, of the Social Security Act, payments to a State under any such titles for any quarter in the period beginning July 1, 1976, and ending September 30, 1977 may be made with respect to a State plan approved under such title prior to or during such period, but no such payment shall be made with respect to any plan for any quarter prior to the quarter in which a subsequently approved plan was submitted.

Such amounts as may be necessary from this appropriation shall be available for grants to States for any period in fiscal year 1976 and the period July 1, 1976 through September 30, 1976 subsequent to March 31, 1976.

\*    \*    \*    \*    \*    \*

Sec. 206. No part of the funds contained in this title may be used to force any school or school district which is desegregated as that term is defined in title IV of the Civil Rights Act of 1964, Public Law 88–352, to take any action to force the busing of students; to force on account of race, creed, or color the abolishment of any school so desegregated; or to force the transfer or assignment of any student attending any elementary or secondary school so desegregated to or from a particular school over the protest of his or her parents or parent.

Sec. 207. (a) No part of the funds contained in this title shall be used to force any school or school district which is desegregated as that term is defined in title IV of the Civil Rights Act of 1964, Public Law 88–352, to take any action to force the busing of students; to require the abolishment of any school so desegregated; or to force on account of race, creed, or color the transfer of students to or from a particular school so desegregated as a condition precedent to obtaining Federal funds otherwise available to any State, school district, or school.

(b) No funds appropriated in this Act may be used for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to overcome racial imbalance in any school or school system, or for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to carry out a plan of

racial desegregation of any school or school system.

Sec. 208. None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, and which offers the courses of study pursued by such student, in order to comply with title VI of the Civil Rights Act of 1964.

Sec. 209. None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term.

Senators Buckley and Helms and Representative Hyde seek to intervene in support of the legislation in their interest as Members of Congress seeking to protect their votes in favor of the legislation from judicial nullification, and in their interest as citizen-taxpayers.

■ A legislator has a recognized right to sue to secure legal recognition of the effectiveness as an enactment of a bill for which he voted but which has—with arguable impropriety—been denied promulgation as a law (*Kennedy v. Sampson*, 1974, 167 U.S.App.D.C. 192, 511 F.2d 430), or to annul a concurrent resolution on the ground that it had not in fact been adopted because one indispensably necessary vote was unauthorized in law (*Coleman v. Miller*, 1939, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385). In such cases the right to sue derives from the legal injury done to the legislator's vote as integral to the process of enactment; the litigation is addressed to establishing the efficacy of the legislator's vote as a vote to be counted in the legislative process. But that clear right—in effect, to have his vote counted at its full legal value—is not involved here. No one has challenged the correctness of the process of enactment. The challenge is to the constitutional validity of one section of a correctly enacted law. To grant intervention on the ground of the members' participation in enacting the law would involve accepting as a principle that each member of the Congress has an interest to intervene in every case in which the substantive constitutionality of a provision in a federal enactment was drawn into question, or indeed, in which the interpretation of a federal statute was in question. *Cf. Holtzman v. Schlesinger*, 2d Cir. 1973, 484 F.2d 1307, 1315.

*Flast v. Cohen*, 1968, 392 U.S. 83, 102–103, 88 S.Ct. 1942, 20 L.Ed.2d 947, although it dealt with an income-taxpayer's interest in preventing expenditure of public funds, would indicate the existence of a taxpayer interest in the present case, an interest to prevent a specific type of expenditure in contravention of a very specific statute. The Congress, it seems, had before it evidence, furnished by the Department of Health, Education and Welfare, that the Medicaid expenditure occasioned by full term births was several fold the expenditure for lawful abortion. But the taxpayer interest is rather in the legality of the expenditure than in private tax savings. The test is the immediacy and specificity of the citizen-taxpayer's concern with the substantive principles involved in the challenged species of public expenditure. *Flast v. Cohen* can hardly be said to have been extended, but it has not been overruled, and it is concluded that the senators and the representative have brought themselves within it in their roles as citizen-taxpayers. It should be said that, were intervention not permissible, the assistance of the intervenors' papers as submissions of *amici curiae* would have been equally welcome.

■ The contention that an order requiring continued payment for lawful abortions would be an illicit attempt to appropriate funds from the Treasury cannot be sustained. The language of the Act makes clear that Congress has appropriated what it judges sufficient money for carrying out Title XIX and that it has sought only to restrict the circumstances in which the funds can be used to pay providers of lawful abortional services. If that prohibition of use transgresses constitutional rights, it cannot be given effect. Payment of funds will follow, but not by an act equivalent to

appropriation. *United States v. Lovett,* 1946, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252, dealt with a section of an appropriation act which, similarly, forbade the use of any part of the money appropriated by the Act for a specific purpose—in that case, the payment of salaries to three federal employees who had been accused of being "subversives." The Court held that the prohibitory section did not bar the payments of the employees' salaries because the section was unconstitutional as, in substance, a bill of attainder. Counsel for the Congress argued unsuccessfully the exclusive and complete control of the Congress over the disbursing process and that the issues raised by the section were not justiciable. So here, the section is a constraint on the use of appropriated funds, and, if the constraint here is one that cannot be lawfully imposed for constitutional reasons, as it was in *Lovett,* then there is here no bar to the payment of the money for abortional services.

It is argued that it is improbable that the challenge to the validity of the Section 209 will succeed. It is contended that Section 209 fits a consistent pattern of affirmatively encouraging, and of requiring state plans to offer, family planning services and of excluding abortion from the array of licit family planning methods. And it is argued that *Legion v. Richardson,* S.D.N.Y.1973, 354 F.Supp. 456, 414 U.S. 1058, holding valid so much of Title XIX as excludes federal grants for the long-term care of inpatients aged 21 to 65 in mental hospitals, signifies that exclusions from Medicaid coverage are not necessarily invalid. But the clear concern for making family planning available is not related to the issues raised by Section 209. That section is, ultimately, concerned with the denial of medical assistance to the needy. It is not validated by putting it in juxtaposition with the federal encouragement of family planning, for it would appear, put in that relation, as punitive, as a retributive act, not a simple, non-invidious decision not to provide a type of medical assistance. The section is aimed at conduct and is not oriented to need. *Legion,* in

contrast, was found by the Court, in substance, to be a reasoned legislative decision not to extend Medicaid into the field of long-term inpatient treatment of the insane aged 21 to 65, and to be free of invidious discrimination in the making of that choice. The appeal there must be to the Congress and not to the courts.

The Court has made clear (*Roe v. Wade,* 1973, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; *Doe v. Bolton,* 1973, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 147) that the constitutionally protected personal rights of women include the right to terminate pregnancy in consultation with their physicians, and that the state's interest enters only in the second trimester, and is then extended only to taking measures to preserve and protect maternal health. *Planned Parenthood of Missouri v. Danforth, supra,* makes additionally clear that the state cannot require that a woman's spouse consent to abortion, nor require, in the case of a woman under the age of eighteen years, that she obtain the consent of one parent to an elective abortion.

The cases in the District Courts and the Courts of Appeal which have invalidated efforts of certain of the states under their Title XIX plans to deny Medicaid reimbursement for elective abortions establish the probability that plaintiffs will prevail on the ultimate issue of merit. *Klein v. Nassau County Medical Center, supra; Roe v. Norton, supra; Wulff v. Singleton,* 8th Cir. 1974, 508 F.2d 1211, *rev'd in part, Singleton v. Wulff, supra; Doe v. Rose,* 10th Cir. 1974, 499 F.2d 1112; *Doe v. Westby,* D.S.D.1975, 402 F.Supp. 140; *Doe v. Rampton,* D.Utah 1973, 366 F.Supp. 189; *Doe v. Wohlgemuth,* W.D.Pa.1974, 376 F.Supp. 173, *aff'd, sub nom., Doe v. Beal,* 3d Cir. 1975, 523 F.2d 611. (The Supreme Court will determine the issue.)

The women affected by the enactment of Section 209 are denied no other medical assistance; they are, as Medicaid eligibles, undeniably entitled to medical assistance in their pregnancies. Section 209, however, would deny them reimbursement for medi-

cal assistance only if they elect to exercise their constitutionally protected right to terminate their pregnancies. Others who have the means to pay for medical services are free by virtue of our positive law to exercise their constitutional right to terminate their pregnancies, but the needy, the wards of government, would by this enactment be denied the means to exercise their constitutional right.

It does not alter the case to say that taxpayers ought not be called on to pay for abortional services, that their refusal, through the Congress, to do so, leaves the indigent woman free to exercise her constitutional right with the help of those who are willing to assist her. The freedom is unreal. It remains true that needed medical assistance is denied solely because the woman has chosen to exercise a constitutionally protected right. Section 209 will not in fact save public funds and so give relief to taxpayers, for as noted above, the Congress was advised that the alternative costs for medical assistance during prenatal care, at birth and after are very much greater.

It is undeniable that Section 209 expresses a strongly and widely held disapprobation of lawful abortion. The view is profoundly rational and espoused with religious fervor. It is neither purely sectarian nor identifiable with any political allegiance. But on this issue fundamental philosophical beliefs are in direct conflict. What some regard as denigration of the sanctity of human life others regard as involving no such matter, for the definition of human life is itself in debate (cf. Byrn v. New York City Health and Hospitals Corp., 1972, 31 N.Y.2d 194, 335 N.Y.S.2d 390, 286 N.E.2d 887, appeal dismissed, 1973, 410 U.S. 949, 93 S.Ct. 1414, 35 L.Ed.2d 683), and visualize opposition to lawful abortion as both inhumane and callously indifferent to the tragic lot of the unwanted child. Divisions between sober and God-fearing people so deep and equal deny to civil authority any power to intervene by direction or indirection, either to compel abortion as a measure of population control or to deny medical assistance to the needy who act on their own beliefs. When the power of enactment is used to compel submission to a rule of private conduct not expressive of norms of conduct shared by the society as a whole without substantial division it fails as law and inures as oppression.

The petition for the appointment of a guardian ad litem for unborn children raises, again, the primary contention that Roe v. Wade and the cases applying it have been wrongly decided, and that, in any event, in this new phase of the litigations the interests of the unborn should be represented. It is concluded that the contentions made for the class must be rejected. Nevertheless, the contention that the class should be represented may not be rejected; for that reason the right to intervene is granted, and the guardian's contentions have been considered.

It is argued that plaintiffs are not now harmed, may never be harmed, if the state pays for the abortions, and, therefore, are not entitled to relief by preliminary injunction. But in fact the apprehension of the providers is substantial, and the risk to the women seeking abortions is real. The harms are peculiarly irreparable in kind. The federal funding and planning is critically important. It is idle to suggest that that the withdrawal of federal support and the lead the federal government has sought to take will not result in renewed efforts by the states to deny the needed medical assistance in these cases. The two Central Services Unit, State of New Mexico, Memoranda (CSU–76–13, CSU MEMO 76–14) (attached to affidavit of Lewis Koplik sworn to October 15, 1976) illustrate the effect: on the enactment, the Unit announced that it would reimburse only for therapeutically necessary abortions; after restraining orders were entered, the Unit cancelled the first announcement and resumed reimbursement. The affidavit of Alfred F. Moran, sworn to October 15, 1976, shows that the office of the New York Commissioner of Social Services is not prepared to

commit the Department to continued reimbursement if the federal payments are terminated. The affidavit of Stephen Goldberg, sworn to October 15, 1976, is to the same effect. Without a continuance of the federal payments, it is clear that irreparable harm will be done to the indigent women involved. To continue the payments is to preserve the *status quo* until the rights involved are authoritatively determined.

This is not a case in which security is required. It is not usual to require it in the case of poor persons, and it would be inappropriate to require it of the Hospitals Corporation. Planned Parenthood and Dr. Teran are in a different situation, but in this case no monetary harm is threatened. Rather the lawful abortional acts will operate to diminish Title XIX payments.

It is, accordingly,

ORDERED that

1. Plaintiff Cora McRae is entitled to maintain this action as a class action pursuant to Rule 23(a), (b)(1) and (2), on behalf of the class of pregnant or potentially pregnant Medicaid-eligible women in the State of New York, who, in consultation with their physicians, decide within twenty-four weeks after the commencement of pregnancy, to terminate their pregnancies by abortion;

2. Plaintiff Dr. Irwin Teran is entitled to maintain this action as a class action pursuant to Rule 23(a), (b)(1) and (2), on behalf of the class of duly licensed and Medicaid-certified providers of abortional services to Medicaid-eligible pregnant women;

3. The defendant, his successors in office, agents, servants, employees, attorneys, and those other persons in active concert and participation with him who receive actual notice of this order by personal service or otherwise

A. Cease to give effect, in any way to Section 209 of Public Law 94–439, and cease from discriminating, in the provision of Medicaid payments, against women who choose or who have chosen abortion and in favor of women who choose or have chosen to carry their pregnancies to term; and

B. Continue to authorize and expend federal matching funds for abortions provided to women eligible for Medicaid at the proportionate level and in accordance with the standards under which they were being paid before enactment of Section 209 of Public Law 94–439, and treat requests for medicaid reimbursement for abortions performed for Medicaid-eligible women by duly certified providers on the same basis as they would requests for reimbursement for medical services and hospital care occasioned by carrying a pregnancy to term;

C. Forthwith communicate the following notice to the Regional Directors of the Department of Health, Education and Welfare with instructions that they promptly disseminate this notice to all State Medicaid authorities within their region, with instructions to the State agencies that they in turn communicate this notice to all local Medicaid authorities, and providers (hospitals, doctors and clinics) of pregnancy-related care to Medicaid-eligible women. The notice shall read as follows:

In conformity with the order of the United States District Court for the Eastern District of New York, entered October 22, 1976, which enjoins enforcement of the Hyde Amendment, the Department of Health, Education and Welfare will provide reimbursement for all abortions provided to Medicaid-eligible women by certified Medicaid providers on the same basis as the Department pays reimbursement for pregnancy and childbirth-related services.