PRETERM, INC., et al., Plaintiffs, Appellants,

v.

Michael S. DUKAKIS et al., Defendants, Appellees.

PARENTS' AID SOCIETY, INC., et al., Plaintiffs, Appellants,

v.

Alexander E. SHARP II, Defendant, Appellant.

PARENTS' AID SOCIETY, INC., et al., Plaintiffs, Appellants,

v.

Alexander E. SHARP II, Defendant, Appellee.

Nos. 78–1324 to 78–1326.

United States Court of Appeals, First Circuit.

Argued Oct. 6, 1978.
Decided Jan. 15, 1979.

Nancy Gertner, Boston, Mass., with whom Silverglate, Shapiro & Gertner, Barbara Sard, Roxbury, and John Reinstein, Boston, Mass., were on brief, for Preterm, Inc., et al.

S. Stephen Rosenfeld, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Garrick F. Cole, Asst. Atty. Gen., Boston, Mass., were on brief, for Sharp, et al.

Joseph J. Balliro, Boston, Mass., with whom Joan C. Schmidt, Boston, Mass., was on brief, for Parents' Aid Society, Inc., et al.

Joseph J. Hurley and Nutter, McClennen & Fish, Boston, Mass., on brief, for William A. Lynch, M.D., et al., amici curiae.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

In this case we are called upon to assess the validity, in terms of compliance with the federal Medicaid Act, of Chapter 367, § 2, Item 4402–5000 of the Massachusetts Acts of 1978. Chapter 367 is an appropriations provision, limiting the expenditure of state funds for abortions to those abortions "which are necessary to prevent the death of the mother" and to those procedures "necessary for the proper treatment of the

victims of forced rape or incest" if the incident is properly reported within thirty days.

At issue, as well, is the impact on the Medicaid Act and state plans thereunder of the Hyde Amendment, Section 101 of Pub.L. 95–205; 91 Stat. 1460 (Dec. 9, 1977), first enacted as a rider to the FY 1977 Health, Education and Welfare appropriations bill. The Hyde Amendment for FY 1978 prohibits federal funding for abortions except "where the life of the mother would be endangered", when the woman is a "victim of rape or incest" and reports the incident "promptly" and in instances where "severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so ·determined by two physicians."[1]

The district court found that Chapter 367 violated specific provisions and the basic thrust of the Medicaid Act by failing to provide for abortions that were "medically necessary". However, because the court considered it "anomalous" to impose upon the state the obligation to fund "medically necessary" abortions for which the Hyde Amendment had prohibited federal funding, its preliminary injunction modified Chapter 367 to require state payment for at least those abortions funded under the Hyde Amendment. The court did not reach the constitutional arguments of the parties. See Hagans v. Levine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

Preterm, Inc., et al., plaintiffs below, then sought an expanded injunction pending appeal of the district court's preliminary injunction.[2] We granted that relief,

---

1. A number of lower courts have considered the compliance of state plans, similar to that of Massachusetts, with the Medicaid Act and have reached differing results. See, e. g., Emma G. v. Edwards, 434 F.Supp. 1048, D.C.Cir. (1978) (court issued preliminary injunction enjoining enforcement of statute which barred use of state funds for abortions "except when the abortion is medically necessary to prevent the death of the mother"); Roe v. Casey, Civ. Action No. 78–2214 (E.D.Pa. June 30, 1978) (district court issued temporary restraining order preventing state from refusing to reimburse providers for medically necessary abortions); D. R. v. Mitchell, 456 F.Supp. 609 (D.Utah June 30, 1978) (court granted state's motion for summary judgment and held that Medicaid Act does not require funding of all medically necessary abortions, but only those when the mother's life was endangered, relying in part on the Hyde Amendment's language); Zbaraz v. Quern, Civ. No. 77C 4522 (N.D.Ill. May 15, 1978) (on remand from the Seventh Circuit, 572 F.2d 582 (7th Cir. 1978) (district court enjoined state from denying reimbursement for therapeutic abortions and found that Hyde Amendment had no impact on the state's obligations); Smith v. Ginsberg, Civ. No. 75–0380 CH (S.D. W.Va. May 9, 1978) (district court enjoined enforcement of statute to extent it denied reimbursement for necessary therapeutic abortions, ordered parties to brief the Hyde Amendment issue).

In Doe v. Kenley, 584 F.2d 1362 (4th Cir. 1978), the Fourth Circuit considered the "limited" issue of whether a state which has established a policy for the stated objective of eliminating state medical assistance for nontherapeutic abortions may implement that policy by requiring a physician to certify that the woman's life would be endangered if the pregnancy was carried to term. It rejected the state's argument, adopted by the district court, that the words "endangerment of life" really meant "endangerment of health" and remanded the case directing that an order be entered clarifying the state's standard for funding abortions. The court further stated "that on the facts of this case we need not reach the statutory and constitutional issues raised by Doe of whether a state may be compelled by either Title XIX or the Constitution to fund induced therapeutic abortions." Id. at 1365.

Thus, we believe that this court is the first court of appeals to reach the issues presented by this case.

2. The named plaintiffs in No. 78–1324 are Preterm, Inc., a nonprofit corporation providing clinical services; including abortions, for indigent women; board-certified obstetricians and gynecologists practicing in Massachusetts; a Medicaid-eligible pregnant woman residing in Massachusetts; Massachusetts Welfare Recipients for Welfare Reform, an association of public assistance recipients; and Planned Parenthood League of Massachusetts, an unincorporated agency providing abortion counseling. In Nos. 78–1325 and 78–1326, the named plaintiffs, some of whom were dismissed below for lack of standing, see infra, are several Medicaid-eligible pregnant women; a Massachusetts physician and Medicaid provider; and an abortion counselor and director of Parents Aid Society, Inc., a non-profit Massachusetts corporation providing abortion counseling, which is also a plaintiff. The defendants in these cases are various officials of the Commonwealth of Massachusetts.

The district court also certified, pursuant to Fed.R.Civ.P. 23(c)(1), two classes of plaintiffs

and modified the district court's injunction to require the Commonwealth of Massachusetts to provide funding for abortions to "all Medicaid-eligible pregnant women who desire to obtain an abortion and for whom a physician has determined that an abortion is a medically-necessary service". Subsequently the district court ordered consolidation of the preliminary injunction with the merits and entered its preliminary injunction as a final order. All parties have appealed, and it is the district court's final order that is before us on review. We turn first to the question whether Chapter 367 violates the requirements of the Medicaid Act by providing for abortions, in circumstances other than pregnancy resulting from forced rape or incest, only when the abortion is "necessary to prevent the death of the mother".

## I. *The Requirements of the Medicaid Act*

The Medicaid Act, Title XIX of the Social Security Act of 1965, operates to enable participating states, through the use of federal funds, to provide medical services to welfare recipients (the "categorically needy") and if the state chooses, to other needy recipients (the "medically needy"). *See Beal v. Doe,* 432 U.S. 438, 440 n.1, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); 42 U.S.C. § 1396a(a)(10)(A), (C). Although a state's participation in Medicaid is voluntary, if it chooses to adopt a plan it must do so consonant with the requirements imposed by the Medicaid Act. *See Beal v. Doe, supra,* 432 U.S. at 441, 97 S.Ct. 2366; *White v. Beal,* 555 F.2d 1146, 1149 (3d Cir. 1977); *Rush v. Parham,* 440 F.Supp. 383, 385 (N.D.Ga. 1977).

The plaintiffs below argue, and the district court found, that abortions, when "medically necessary" as determined by a physician are within the category of services which a state must provide. The state, on the other hand, contends that participating states are afforded great latitude in deciding which services will be furnished under their plans, and maintains that the Act nowhere requires a state to provide all "medically necessary" services. The disagreement between the parties is thus a fundamental one, and one which our study of the statute has not easily resolved.

■ Our analysis begins with the opening section of the Act, which both authorizes an appropriation and sets forth a general statement of purpose:

"*42 U.S.C. § 1396. Appropriation*

For the purpose of enabling each State, *as far as practicable* under the conditions of such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled *individuals, whose income and resources are insufficient to meet the costs of necessary medical services,* and (2) rehabilitation . . ., there is hereby authorized to be appropriated . . .." (emphasis added).

The district court and other courts which have found a requirement within the Medicaid Act that states provide all "medically necessary" services have relied heavily on this section. *See, e. g., Rush v. Parham, supra,* 440 F.Supp. at 389. It does not seem, however, that the words "necessary medical services" are properly read as a substantive requirement imposed on the states. Instead, this section merely specifies for whose benefit federal funds are to be appropriated—those "individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. *See also* 42 U.S.C. § 1396a(a)(10)(C). Furthermore, the section apparently contemplates some flexibility in the Act's demands on each state, stating that its purpose is to enable a state to furnish medical assistance "as far as practicable under the conditions in such State."

Our view finds support from the structural composition of the Act. Section 1396a is

___

in the Preterm action: the first consisting of "all Medicaid-eligible pregnant women who desire to obtain an abortion and for whom a physician has determined that an abortion is a medically-necessary service but for whom an abortion is not necessary to prevent death", and second, "all physicians and other Medicaid providers . . . willing to perform abortions for women who fall within the first class."

the provision which details the required contents of a state plan for medical assistance. Among the 37 items listed, we find no mandate that all "medically necessary" services be provided. We therefore hesitate to draw the words "necessary medical services" from their context—an appropriations section—and in effect transport them into a contents section requirement.

Although we are unable to discover a statutory requirement that states provide medically necessary services, we do find guidance within the statute, albeit less explicit, for deciding this case. Section 1396a requires that a state plan for medical assistance provide five general categories of medical services to the categorically needy, enumerated in § 1396d(a): (1) inpatient hospital services, (2) outpatient hospital services, (3) other laboratory and x-ray services, (4) skilled nursing facilities, screening and treatment for persons under the age of 21 and family planning services and supplies, and (5) physicians' services.[3] In *Beal v. Doe, supra,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464, the Supreme Court, deciding whether a state plan which denied funds for abortions unless they were certified by a physician as "medically necessary" was violative of the Medicaid Act, stated that: "Title XIX [Medicaid] does not require States to provide funding for all medical treatment falling within the five general categories". But, "it does require that State medicaid plans establish 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Title XIX].' 42 U.S.C. § 1396a(a)(17) (1970 ed., Supp. V)." *Id.* at 440–41, 97 S.Ct. at 2369. The Court further emphasized that the Act "confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act.", *id.* at 444, 97 S.Ct. at 2371, and concluded that the state's "refusal to extend Medicaid coverage to nontherapeutic abortions is not inconsistent with Title XIX." *Id.* at 447, 97 S.Ct. at 2372.

The Court's opinion contains a dictum relied on by the district court: "*[A]lthough serious statutory questions might be presented if a state medicaid plan excluded necessary medical treatment from its coverage,* it is hardly inconsistent with the objectives of the Act for a State to refuse to fund *unnecessary*—though perhaps desirable—medical services." *Id.* at 444–45, 97 S.Ct. at 2371 (emphasis added to introductory clause). This language is indeed relevant to the issue at hand—the validity of a state plan which allows payment for abortion services in other than cases of rape or incest only when "necessary to prevent the death of the mother"; but we do not believe that we should read this dictum as signalling a flat rule that all services within the five general categories deemed "medically necessary" by a patient's physician must be provided by the state plan.

Such a reading, permitting the most varied content to the words "necessary medical services", the variations being theoretically limited only by the diversity of physicians, would seem at war with the goals of consistency and fairness in the administration of the statute. We see two levels of judgment as to medical necessity in the statutory scheme. The first is the macro-decision by the legislature that only certain kinds of medical assistance are deemed sufficiently necessary to come under the coverage of its plan. The second is the micro-decision of the physician, that the condition of his patient warrants the administering of a type of medical assistance which that plan makes available. Our task here is to test the judgment of the Massachusetts legislature as to medical necessity, i. e., was its decision to limit state funded abortions, in other than cases of rape or incest, to those necessary to save the life of the woman "reasonable" and "'consistent with the objectives' of [Title XIX]"? 432 U.S. at 441, 444, 97 S.Ct. at 2371; *see* 42 U.S.C. § 1396a(a)(17).

The regulations promulgated by the Department of Health, Education and Welfare

---

**3.** States are given a greater choice in determining the types of services that it provides to the "medically needy". 42 U.S.C. § 1396a(a)(13)(C).

pursuant to the Medicaid Act and having the force of law, detail the permissible and impermissible ways in which a state may exclude or diminish payment for certain services in its plan. 42 C.F.R. § 440.230 (1978) provides that:

"(a) The plan must specify the amount and duration of each service that it provides.

(b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.

(c)(1) The medicaid agency may not deny or reduce the amount, duration, or scope of a required service under §§ 440.210 [for the categorically needy] and 440.220 [for the medically needy] to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition.

(2) The agency may place appropriate limits on a service based on medical necessity or on utilization control procedures."

The plaintiffs below maintain that the limitations imposed by Massachusetts on abortion services render those services insufficient in "amount, duration and scope" to reasonably achieve their purpose, and that the limitations are based solely on the type of medical condition involved rather than on determinations of medical necessity.

In *White v. Beal,* 555 F.2d 1146 (3d Cir. 1977), the Third Circuit construed this regulation in determining whether a state plan, which made eyeglasses available to persons who needed them because of eye pathology but denied them to persons suffering from other types of visual impairment, violated the Medicaid Act. The court held that the plan was violative of the Act because it distributed the service in a manner which did not bear a rational relationship to the "underlying federal purpose of providing the service to those in greatest need of it", *id.* at 1151. Citing 45 C.F.R. § 249.-10(a)(5)(i), the earlier codification of the regulation, it stated that "[t]he regulations permit discrimination in benefits based

upon the degree of medical necessity but not upon the medical disorder from which the person suffers." *Id.* at 1151–52.

■ We think that the limitations imposed by Chapter 367 on abortion services similarly violate the purposes of the Act and discriminate in a proscribed fashion, although perhaps less obviously than did the plan in *White v. Beal, supra.* It could perhaps be argued that the Massachusetts plan reserves abortion services to those in greatest need—women who will die without an abortion—and denies it to those who need it less—women who will suffer damage to their health, no matter how grievous, but who will survive without the abortion. But we do not believe that the Medicaid Act contemplates or sanctions anything so stark. When a state singles out one particular medical condition—here, a medically complicated pregnancy—and restricts treatment for that condition to life and death situations it has, we believe, crossed the line between permissible discrimination based on degree of need and entered into forbidden discrimination based on medical condition.

The Medicaid system was established for the purpose of enabling a state, with federal participation, to provide medical assistance to eligible individuals in need of treatment and unable to pay for it. *See* 42 U.S.C. § 1396. We find it "unreasonable" and wholly "[in]consistent with the objectives of the Act", 42 U.S.C. § 1396a(a)(17), for a state to provide abortion services and then, with limited exceptions for victims of rape and incest, deny it to all those who will not die without it. We know of no other instance where a legislative decision to pay for medical care is based on the distinction between life and death. If only those suffering at death's door from sickle cell anemia or syphilis could receive publicly provided medical care, but not those condemned to a lifetime of dependency, one would be hard put to discern any rational social objective being thereby served. So we think here.[4] In addition, Chapter 367 is

---

**4.** The limitations in the Massachusetts Act clearly cannot be justified as a cost-saving

mechanism. *See White v. Beal,* 555 F.2d 1146, 1150 (3d Cir. 1977). It is uncontroverted that

inconsistent with the Act, which provides for a central role for the physician in determining proper treatment, by circumscribing his professional judgment so drastically. As a physician's affidavit submitted on behalf of the plaintiffs below attests "[a] standard of medical necessity which considers only the certainty or likelihood of a patient's death is alien and antithetical to medicine in general. I know of no area of medical practice in which a physician exercises professional responsibility solely in terms of life and death assessments."

Accordingly, we conclude that Chapter 367 fails to provide abortion services consistent with the requirements of the Medicaid Act. We now turn to the question of the impact of the Hyde Amendment on state plans adopted pursuant to that Act.

## II. The Impact of the Hyde Amendment

The Hyde Amendment, the name given to language inserted into the FY 1977 and 1978 Health, Education and Welfare appropriations bills, in its current form prohibits use of appropriated federal funds for Medicaid abortions except in specified situations.[5] The first two are similar to those in Chapter 367—instances where "the life of the mother would be endangered" and when she is the victim of rape or incest and reports the incident promptly. The Hyde Amendment differs from the Massachusetts Act, however, by providing a third exception—"where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians."[6]

Plaintiffs contend that the Hyde Amendment must be construed according to its literal terms as authorizing federal funds for certain limited categories of abortions and thus shifting the total cost to the states of providing those abortion services not funded by the Hyde Amendment but nonetheless required by the Medicaid Act. They maintain that the Hyde Amendment has no impact on a state's obligations to provide services required by the Act.

The state, on the other hand, argues that even if this court should find, as it has, that Chapter 367 contravenes the Medicaid Act

---

the costs of medical treatment necessary when even healthy pregnancies are carried to full term exceed the costs of therapeutic—or even elective—abortions. *See Maher v. Roe*, 432 U.S. 464, 478–79, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

**5.** Congress, in the final days of the Second Session of the 95th Congress, reenacted the identical language in its FY 1979 HEW appropriations bill.

**6.** Several district courts have commented on the impact of earlier versions of the Hyde Amendment on the Medicaid Act. In *McRae v. Mathews*, 421 F.Supp. 533, 538 (E.D.N.Y.1976), the court found that:

"The manifest fact is that [the Hyde Amendment] is calculated to stop the provision of abortional services from public funds; it is not calculated to shift the burden of providing this medical assistance to the states."

Finding probable success on the merits in light of cases which found plans eliminating elective abortions invalid, the court enjoined the Secretary of Health, Education and Welfare from denying Medicaid reimbursement for elective abortions. The case was vacated and remanded on appeal for further consideration in light of *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53

L.Ed.2d 484 (1977) and *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). *See Califano v. McRae*, 433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103 (1977); 434 U.S. 1301, 98 S.Ct. 27, 54 L.Ed.2d 11 (1977).

In contrast, in *Doe v. Mathews*, 420 F.Supp. 865, 869 (D.N.J.1976), the court refused to issue a temporary restraining order preventing the Secretary from enforcing the Hyde Amendment, in part, because:

"[Title XIX] was not amended or affected by the Hyde Amendment. Title XIX remains in force, as it stood when *Beal* and *Klein* was decided. The Hyde Amendment affects the federal appropriation to HEW for fiscal 1977, and its application is limited to the treatment of items of cost incurred by a Medicaid State for which federal funds can be paid to that State. It has no application to the kinds of items for which a State must pay if it has enacted a Medicaid Law."

*See Doe v. Mathews*, 422 F.Supp. 141 (D.D.C. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 29, 54 L.Ed.2d 60 (1977) (court found that plaintiffs had no standing to sue the Secretary in a Hyde Amendment challenge, not having demonstrated that state officials would, or could pursuant to Title XIX or the Constitution, deny reimbursement for abortions other than those provided for in the Hyde Amendment).

by providing abortions in cases other than rape or incest only when necessary to prevent the woman's death, the Hyde Amendment constitutes a congressional statement that the states need not fund more abortions than Congress is willing to fund, although they could choose to do so if they wished. The Hyde Amendment, according to the state, is to be viewed as a policy decision concerning a state's obligations to provide publicly funded abortions and not as merely a shifting of the costs of non-Hyde Amendment abortions to the states. In support of its position, the state points to the congressional debates which preceded passage of the Amendment as well as the basic structure of the Act, namely joint federal and state participation in providing medical assistance to the needy. Apparently relying on this latter factor, the district court found that it would be "anomalous" to require states to pay for abortions for which the Hyde Amendment had withdrawn federal funds and enjoined the state from refusing to provide abortions for which Hyde Amendment funds were available. By so ruling, the court implicitly concluded that the Hyde Amendment should be read as having a substantive effect on the state's obligations under the Medicaid Act and not merely as a shifting of the responsibility to pay for abortions.

Our inquiry begins with the words of the statute itself, which if clear, ordinarily obviate the need to resort to extrinsic aids of statutory construction. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 2296 n.29, 57 L.Ed.2d 117 (1978); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *Massachusetts Financial Services, Inc. v. Securities Investor Protection*, 545 F.2d 754, 756 (1st Cir. 1976). The language of the Hyde Amendment, on its face, supports the plaintiffs' position. The Amendment states that "none of the funds provided for in this paragraph shall be used" to perform abortions, unless they fall within specified categories, and thus reads as a mere withdrawal of federal funds for certain services. No mention is made in the provision of any impact on the state's obligations. However,

when the plain meaning of a statute produces a result " 'plainly at variance with the policy of the legislation as a whole' " and "aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1939); *Massachusetts Financial Services, Inc. v. Securities Investor Protection, supra*, 545 F.2d at 756. The construction urged by the plaintiffs would result in imposing an obligation on the states to fund the total cost of non-Hyde Amendment therapeutic abortions, a result not consonant with the basic policy of the Medicaid system under which the federal government participates in the funding of medical services provided by the states. *See* 42 U.S.C. § 1396; *Beal v. Doe, supra*, 432 U.S. at 440, 97 S.Ct. 2366; *White v. Beal, supra*, 555 F.2d at 1149. We therefore think it necessary to consider the legislative history of the Hyde Amendment.

*The Legislative History*

Congressional consideration of the Hyde Amendment began in the House of Representatives on June 17, 1977 and ended with a Senate debate and vote on a compromise measure on December 7, 1977. During this six month period some ten different versions were passed in one of the chambers, *see* CCH Medicare-Medicaid Reporter ¶ 28,-832, at 9151, and no fewer than 25 roll call votes had been taken in the House and Senate. Congressional Quarterly, Weekly Report, Vol. XXXVI No. 5 at 258 (Feb. 4, 1978). There are neither conference reports nor committee reports; all we have are the debates and insertions in the Congressional Record. These, however, if considered as a whole, are illuminating. The leaders of both sides in the debate spoke often and long enough and clearly enough so that there is no doubt about what the Congress wanted to do and thought it was doing.

To begin with, there are a few observations to the effect that all that the Amend-

ment is concerned with is the expenditure of federal dollars. For example, on the first day of debate in the House, Congressman Doran said, "It simply denies Federal funds for the realization of a personal . . decision . . . ." 123 Cong.Rec.H. 6086 (June 17, 1977). Similarly, Congressman Edwards observed that "the only thing over which we have any control is what we do with Federal dollars." *Id.* at 6090. Much later, Congressmen Hyde and Flood made statements to the effect that the issue at hand concerned the use of federal funds for abortion. 123 Cong.Rec.H. 10826–30 (Oct. 12, 1977). *See* 123 Cong.Rec.S. 11039 (June 29, 1977) (Senators Bellmon and Stennis). Not only are these the only such comments in the entire debate which the briefs of the parties and our own research have unearthed, but even they are consistent with the conclusion that the Congress utilized the device of withholding federal funds as the means of making a substantive change in the law.

Moreover, the record is clear that both houses of Congress were acutely conscious that they were engaging in substantive legislation. The very first event which took place in the House of Representatives was the making of two points of order, the sustaining of the same, and an amendment by sponsor Hyde simply confining his Amendment to a ban on spending federal funds for abortions, any abortions. Congressman Hyde then expressed his regret that the points of order forced him to exclude mother's-lifesaving therapeutic abortions from his Amendment, adding that he agreed with those who had said it was unfortunate to burden appropriation bills with complex issues such as busing and abortion but that "The problem is that there is no other vehicle that reaches this floor in which these complex issues can be involved. Constitutional amendments

which prohibit abortions stay languishing in subcommittee, much less committee, and so the only vehicle where the Members may work their will, unfortunately, is an appropriation bill." 123 Cong.Rec.H. 6083 (June 17, 1977). Subsequently, on August 2, after a candid explanation by Congressman Flood that the only way to enable the Amendment to exclude from its proscriptions abortions in cases of life endangering pregnancies was to restore the original language, such language was restored and no further points of order were made. 123 Cong. Rec.H. 8348–49 (Aug. 2, 1977).

In the Senate a point of order was made and the Senate, by voting that a Senate version of the Amendment was germane to the subject matter of the House bill, thus satisfying Senate Rule XVI, legitimized its subsequent legislating. 123 Cong.Rec.S. 11055 (June 29, 1977). Before the vote was taken, Senator Brooke lodged this protest:

> "Mr. President, I urge the Senate to support the amendment striking all restrictions on the use of medicaid funds for the performance of abortions. Such restrictions are a blatant case of legislating on an appropriations bill, a most unwise practice and one which I adamantly oppose regardless of the subject." *Id.* at S. 11035.[7]

At the very end of the process Senator Magnuson, a proponent of fewer restrictions, expressed his unhappiness, saying pithily, "I have said many, many times, as sort of a voice in the wilderness, that this does not belong on the HEW bill. It is legislation of the rawest nature on an appropriations—money—bill." 123 Cong. Rec.S. 19440 (Dec. 7, 1977). And Senator Stennis, a supporter of greater restrictions on abortions, complained about the Senate's "obscure rules about amendments on appro-

---

**7.** Senator Brooke continued, voicing other objections to the proposed Amendment:

"However, I oppose restrictions on medicaid abortions for other equally valid reasons. First, the Senate should not through a funding decision in effect deprive our most vulnerable and helpless citizens, the poor, of an established constitutional right. Second, the

Senate should not so thoughtlessly try to impose simplistic solutions on so complex an issue. And third, the Senate should not legislate in a medical area in which we have absolutely no competence and dictate medical decisions which a physician and a physician alone is trained and capable to make." 123 Cong.Rec.S. 11035 (June 29, 1977).

priations bills, that contain legislation on appropriations bills", and noted that a "lot of this type of proposals [sic] are in this bill, including the point on abortion." *Id.* at S. 19445. Senator Brooke devoted much of his effort in this part of the debate to making clear "the legislative intent of the provisions we are acting upon . . . . Since [HEW has] not given us any interpretation, I think we should clarify for them what the legislative intent is." *Id.* at S. 19441. Senator Javits called the end result of this six month effort "a milestone in our legislation". *Id.* at S. 19443.

Moreover, the inclusion of very specific and detailed provisions underscored the substantive nature of the legislation being enacted. *See, e. g.,* the comments of Congressman Michel in explaining how the House of Representatives had rejected the inclusion of danger to mental health as a reason for funding abortions, 123 Cong. Rec.H. 12651, 12656 (Dec. 6, 1977); Senator Brooke's and Senator Javits' doubts of the constitutionality of the requirement of a certificate from two physicians that severe and long-lasting physical health damage would occur, 123 Cong.Rec.S. 19440–19443 (Dec. 7, 1977); and Congressman Michel's attempts to define what was meant by the prompt reporting requirement in cases of rape and incest, 123 Cong.Rec.H. 12652–12653 (Dec. 6, 1977).

Perhaps the message of the legislation was conveyed most clearly by those who were opposed to restrictions on publicly funded abortions. Their litany of opposition stressed the harshness of depriving the poor of abortions which the more affluent could afford. The universal assumption in debate was that if the Amendment passed there would be no requirement that states carry on the service. Congressman Stokes referred to the Amendment as "tantamount to a constitutional amendment outlawing abortions for the poor." 123 Cong.Rec.H. 6085 (June 17, 1977). Congressman Holtzman said that it "condemns to death poor women, who, if they give birth, will die . . . ." *Id.* at H. 6092. Others spoke to the same pint, *see e. g., id.* at H. 6097 (Congressman Meyner), 123 Cong.Rec. at H.

10968 (Congressman Sears), *id.* at H. 12656 (Congressman Fraser).

The predictions were no less dismal in the Senate. Senator Packwood said: "Let us be very clear about it. If we do not fund abortions, these 250,000 to 300,000 women who now receive abortions, paid for by Federal or State moneys under medicaid, are either going to have babies they do not want or are going to go to backroom abortionists. There is no question that the poor are going to be discriminated against." 123 Cong.Rec. at S. 11031 (June 29, 1977). Similar remarks were made by Senator McGovern, *id.* at S. 11040; Senator Bayh, *id.* at S. 11043; Senator Brooke, 123 Cong.Rec. at S. 13672 (Aug. 4, 1977); and Senator Javits, 123 Cong.Rec. at S. 19443 (Dec. 7, 1977).

Another variant of the message was that, if the Amendment were passed, the states would have the option to provide abortion on more liberal terms than those contained in the Amendment, but only if they wished to do so. Congressman Russo, a supporter of the Amendment, after expressing satisfaction over the prospect of "saving" 240,000 more lives if the source of funds were eliminated, said, "of course, eliminating Federal funds would not end all Government financing of all abortions. States would retain the option of providing money to poor women for abortions if they want. But the Federal Government's example would encourage States participating in the medicaid program to discontinue this aspect of medical care to the poor—an option States cannot exercise at the present time." 123 Cong.Rec. H. 6097–6098 (June 17, 1977). Other spokesmen to the same effect were Senator Helms, 123 Cong.Rec.S. 18584–18585 (Nov. 3, 1977); Congressman Early, 123 Cong.Rec. at H. 10835 (Oct. 12, 1977); and Congressman Smith, 123 Cong.Rec. at H. 12653 (Dec. 6, 1977).

Finally, the total absence in the debate of any suggestion that massive financial burdens were being shifted to the states further belies plaintiffs' contention that states were to continue to fund abortions beyond those qualifying under the Hyde Amend-

ment. Indeed, were a state to undertake to pick up the burden dropped by the federal government and divert funds from other medical services, the functioning of its entire plan would be crippled.

From this sampling—which we think is a fair representation of the entire Congressional debate—we are persuaded that Congress realized that it was using the unusual and frowned upon device of legislating via an appropriations measure to accomplish a substantive result. That result was, it believed, far more significant than the proscription of federal funding of a program mandated by Medicaid to continue even if only with state funding.

*Repeal by Implication*

Plaintiffs contend that this reading of the Hyde Amendment brings it into conflict with the Medicaid Act and thus violates both the principle that we should endeavor so to construe two statutes that they may be capable of coexistence, "absent a clearly expressed congressional intention to the contrary", *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974), and the equally prominent principle disfavoring repeals by implication, especially repeals via appropriations measures, *Tennessee Valley Authority v. Hill*, 98 S.Ct. 2270, 2299–2300 (1978).

As a preliminary matter, we agree that our construction of the Amendment, as a substantive enactment of a state's Medicaid obligations, produces a conflict with the Medicaid Act. We have held that the Medicaid Act requires an inquiry into whether a state plan which limits reimbursement for certain services, does so in a way that is "reasonable", "consistent with the objectives of the Act", 42 U.S.C. § 1396a(a)(17) and without discriminating solely on the basis of the particular "diagnosis, illness or condition", 42 C.F.R. § 440.230 (1978), and we do not believe that a state plan, funding

only those abortions specified in the Hyde Amendment, would be consistent with these requirements of the Act.[8] The Hyde Amendment does not suffer from the defect of the Massachusetts Act by limiting the availability of funds, except in cases of rape and incest, to life and death situations. Such a discrimination, we determined, could not reasonably be said to be one based on medical need. *See White v. Beal, supra,* 555 F.2d at 1151–52. Nor does the Hyde Amendment reduce the role of the physician to making professional judgments based solely on prevention of the woman's death, as does the Massachusetts Act. We think it important, in terms of its consistency with the Act, that the Hyde Amendment permits funding for abortions needed to prevent "serious and long-lasting physical health damage", a standard that allows a physician's consideration of health needs, short of life and death. The requirements that the damage be "severe" and "long-lasting" apparently are designed to ensure that funds will in fact be reserved to those who most need the treatment.

Thus far, we might feel that we should conclude that the Hyde Amendment, if intended as a substantive statement on a state's obligations, was in no way repugnant with the Medicaid Act's requirements for state plans. However, we are troubled by the Amendment's requirement that the damage be to *physical* health, impliedly excluding abortions needed to prevent severe and long-lasting *mental* health damage. This distinction, if embodied in a state plan, would seem to contravene the Medicaid Act's mandate that a state may not "deny . . . a required service . . . solely because of the diagnosis, type of illness or condition." 42 C.F.R. § 440.230 (1978). Such a discrimination carried to the point of total denial of abortion services when serious injury to a person's mental health if the

---

**8.** Had we concluded, as did the district court, that the Medicaid Act required a state to provide all "medically necessary" services as determined by a physician, the conflict between the Amendment and Medicaid would be readily apparent and far ranging. The narrow catego-ries funded by the Hyde Amendment would certainly not encompass all situations in which a physician, exercising his professional judgment, could certify that an abortion was medically necessary.

pregnancy is carried to term is diagnosed, cannot, we believe, be considered to be based on medical need. *Id.* The discrimination sets up a presumption that physical health damage is always more serious and hence more important to prevent than mental health damage, a presumption that is nothing less than absurd.[9] It follows, without further elaboration, that we could not describe it as "reasonable" or "consistent with the objectives of the Act" to withhold treatment in this fashion. 42 U.S.C. § 1396a(a)(17).[10]

Contrary to plaintiffs' assertions, this conclusion does not compel us to embrace their reading of the Amendment as a mere withdrawal of federal monies. Although that reading may permit the Hyde Amendment and the Medicaid Act to co-exist facially by effecting no change in the Act's requirements for state plans, it requires us to do violence to the Medicaid Act on a more pervasive and fundamental level than would result from reading the Amendment as a substantive alteration of those requirements. The Medicaid program is one of federal and state cooperation in funding medical assistance; a complete withdrawal of the federal prop in the system with the intent to drop the total cost of providing the service upon the states, runs directly counter to the basic structure of the program [11] and could seriously cripple a state's attempts to provide other necessary medical services embraced by its plan.

9. In *Graves v. Fisher*, 361 F.Supp. 1356 (D.Me. 1972), *aff'd*, 412 U.S. 924, 93 S.Ct. 2748, 37 L.Ed.2d 152 (1973), a three-judge court, including members of this court, construed requirements imposed on the states by Title XVI of the Social Security Act analogous to those of Title XIX, the Medicaid Act. It held that Maine had violated the Social Security Act and regulations thereunder by excluding a "category of applicants for disability assistance on the basis of the source of a diagnosed impairment", *id.* at 1359, in particular, persons "suffering solely from psychoneurotic disorders, regardless of severity or permanence". *Id.* at 1357. Although the state in that case had imposed limits on *eligibility* for medical assistance, and we are concerned with attempts by a state to restrict the medical assistance that it provides to eligible recipients, the court's reasoning is equally pertinent here:

"If an applicant can prove that his disability is the functional equivalent of that of other persons receiving assistance, the source of or medical definition of his disability should be irrelevant. . . . [T]he reference in 42 U.S.C. § 1382(a)(13) to 'reasonable standards . . . for determining eligibility' cannot be construed as a license to states to introduce eligibility conditions which relate neither to the duration nor to the degree of an applicant's impairment." *Id.* at 1359.

*See Boisvert v. Zeiller*, 334 F.Supp. 403 (D.N.H. 1971).

10. Whether the legislators realized that they had come into conflict with the Medicaid Act's requirements by so legislating, or believed that the Hyde Amendment, although legislative in impact, was consonant with the Act, we cannot say with certainty. At one point in the debate, several members appeared to suggest that their particular versions of the Amendment were consonant with the Act's requirements. *See* 123 Cong.Rec.S. 11048, 11051 (Senators Schweiker and Brooke). For example, Senator Brooke, arguing for payment for all abortions deemed medically necessary by a physician, stated that "['Medically necessary'] are words of art that are used throughout medical legislation. They are used for all social security funds and for all medical funds." *Id.* at S. 11051. Perhaps we could infer an intent to repeal portions of the Medicaid Act from the fact that the Congress enacted a far more restrictive bill than one which, at least according to Senator Brooke, would be consistent with the Act. We do not believe, however, that we need find express statements in the debates that the Amendment would conflict with the Act; it is enough that the natural result of the clearly expressed intent to legislate was to create a "positive repugnancy" between its restrictions and provisions of the Medicaid Act. Such a repugnancy itself suggests the intent to repeal. *See Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *United States v. Borden Co.*, 308 U.S. 188, 198–99, 60 S.Ct. 182, 84 L.Ed. 181 (1939); *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936).

11. In *McRae v. Mathews*, 421 F.Supp. 533, 538 (E.D.N.Y.1976) (vacated and remanded on other grounds), *see* note 6 *supra*, Judge Dooling rejected the argument that the Hyde Amendment, for FY 1977, had not altered a state's obligations to fund abortions required by the Medicaid Act because:

"The argument overlooks the essential nature of the Medicaid legislation. The state and federal governments are linked in a fiscal partnership to provide for medical assistance to the needy; the program is based on the federal initiative, and the funding is primarily federal (42 U.S.C. §§ 1396, 1396d(b))."

■ Moreover, the principle that two statutes should if possible be found capable of co-existence does not suggest that we should approach the statute with blinders and reconcile them at all costs, even when the second enactment is an appropriations measure. *Tennessee Valley Authority v. Hill, supra,* which plaintiffs have so vigorously invoked as indicating that either express or implied repeal of Medicaid is unthinkable, is not authority to the contrary. Indeed, our analysis of the factors which distinguish that case from the one at bar indicates that our construction of Congressional intent is proper. *Tennessee Valley Authority v. Hill, supra,* involved an unsuccessful argument that the continued appropriating of funds for the Tellico Dam repealed by implication the Endangered Species Act insofar as that Act would otherwise have required construction of the dam to be held up because of the fact that the snail darter and its habitat would be placed in jeopardy. The elements in that case were (1) brief statements of opinion of committee members in a lengthy report, that (2) monies in a very large appropriation act should be used to complete a dam, (3) although the act itself did not identify the approved objects of expenditure, and (4) the act supposedly repealed pro tanto lay in the jurisdiction of another committee. The Court had no difficulty in observing that since legislators are entitled to assume that appropriated funds are to be "devoted to purposes which are lawful", 98 S.Ct. at 2300, there was no basis to suppose that they felt any conflict between funding the dam and the Endangered Species Act. It also noted that there was "no indication that Congress as a whole was aware of [the committees'] views", *id.,* that "the appropriations committees had no jurisdiction over the subject of endangered species", *id.,* and that the "appropriations Acts did not themselves identify the projects for which the sums had been appropriated." *Id.* at 2299 n. 35.

■ Here, in contrast, the objective was a solitary, specific proscription, not a hidden permitted purpose among a multitude; and the appropriation related completely to the subject matter of the affected substantive legislation. In *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), the Court faced a situation more apposite to that at bar. Congress had enacted a proviso, appended to an appropriations bill, that none of the funds appropriated therein were to be used for payment "of any enlistment allowance for 'reenlistments made during the fiscal year ending June 30, 1939, notwithstanding the applicable portions of sections 9 and 10' of the Act of June 10, 1922." *Id.* at 555, 60 S.Ct. at 1035. The Court concluded that Congress had intended to suspend the enlistment allowance authorized by § 9 and not merely to restrict the use of federal funds for that purpose. *Id.* at 561, 60 S.Ct. 1034. It refused to limit its analysis to the "plain and unambiguous" language of that statute and turned to the legislative history which clearly showed Congressional intent to legislate by an appropriations bill. *Id.* at 559–62, 60 S.Ct. 1034.

Furthermore, the legislative history which we have turned to in resolving this case does not suffer from the defects noted by the *Tennessee Valley Authority v. Hill* Court. The statement of Congressional intent upon which we rely is not embodied in appropriations committee reports, which represent merely the views of its members and may never have come to the attention of Congress as a whole. The heated and lengthy debates that led to passage of the numerous versions of the Hyde Amendment took place on the floor of each house, and the views expressed were those of a wide spectrum of its members.

We recognize the force of our brother's dissent, that a court should not infer lightly that Congress has legislated in an appropriations measure so as to repeal a prior enactment, a legislative process that contravenes its rules, and that Congress has not, in so many words, stated that the Hyde Amendment repeals portions of the Medicaid Act. But we are unable to view this six month intensive debate—albeit an emotional one— as a mere exercise in cost-shifting. To so conclude ignores statement after statement

by proponents and opponents of the Amendment that its passage would allow states to choose whether to fund more abortions than those specified therein and that it would affect drastically the lives of poor women by closing off their access to these services. Such a conclusion ignores as well the unquestionably explicit awareness by the legislators that they were using the disfavored vehicle of an appropriations measure to legislate this result and that they were setting aside their rules to do so. Indeed, were these expressions of Congressional intent held to be insufficient in quantity or quality to legislate substantively, we would in candor be forced to admit that legislation in appropriations acts was, as a practical matter, out of the question. Such a determination, regardless of our view of the wisdom of the course chosen by the legislature, is clearly beyond the proper scope of this court.

We hold that the legislative history of the Hyde Amendment is consistent with the cooperative federal-state structure of the Medicaid Act and reveals that the Amendment constituted a substantive policy decision concerning the public funding of abortions which left the states free to fund more abortions than those for which federal funds were made available by the Amendment, but did not require them to do so. The Medicaid Act, to the extent of its repugnancy with the Hyde Amendment, has therefore been altered by the Amendment. *See United States v. Borden Co.*, 308 U.S. 188, 199, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

Our analysis has differed from that of the district court in this case, most importantly, in our conclusion that the Medicaid Act does not mandate that a state provide all medically necessary services as determined by the physician. The result is the same, however, for we determined that the Massachusetts Act violates even our less expansive standard, that the limitation on services be "reasonable", "consistent with the objectives of the Act", and not based "solely . . . [on] the diagnosis, type of illness or condition". 42 U.S.C. § 1396a(a)(17); 42 C.F.R. § 440.230. Furthermore, our decision that the Hyde Amendment was intended as more than a cost-shifting device is consistent with the district court's conclusion on this issue.

■ The judgment of the district court therefore is affirmed, enjoining implementation of Stat.1978, ch. 367, § 2, Item 4402–5000, insofar as it prohibits state reimbursement for abortions which would qualify for federal reimbursement under the terms of the Hyde Amendment. This result is in accord with the state's request that, should an injunction issue, it be modified to allow operation of Chapter 367 consistent with the requirements of the Medicaid Act. The district court properly did not reach the constitutional arguments raised by the parties, because it had statutory grounds for decision. *Hagans v. Levine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). We now remand the case for consideration of the constitutional questions that remain open—namely, whether the Hyde Amendment, construed as a substantive alteration of the Medicaid Act and thus requiring the states to establish plans that provide abortion services in no more than those instances which are specified in the Hyde Amendment, is constitutional.

■ On remand the district court should also afford the plaintiffs who were dismissed from the *Parent's Aid Society, Inc. v. Sharp* actions for lack of standing an opportunity to be heard on the standing issue. Although a court may dismiss an action at its own instance, as apparently happened here, it must first afford the parties an opportunity to oppose the dismissal. *See Literature, Inc. v. Quinn*, 482 F.2d 372, 374 (1st Cir. 1973).

*It is so ordered.*

BOWNES, Circuit Judge (dissenting).

I respectfully dissent.

While I have no problem with my brethren's analysis as to the requirements that the Medicaid Act imposes on a participating state, I cannot agree that the Hyde Amendment has worked a substantive change in those requirements.

The Hyde Amendment was a rider attached to a general appropriations bill for the fiscal year 1978. In addition to making funds available for the Departments of Labor and Health, Education and Welfare, appropriations were made for such disparate purposes as continuing projects and activities as would be available in the District of Columbia Appropriations Act, the Advisory Neighborhood Commissions and the Disaster Loan Fund of the Small Business Administration. Section 101 of Pub.L. 95–205; 91 Stat. 1460 (Dec. 9, 1977).

The language of the paragraph in which the rider was inserted is important:

> Such amounts as may be necessary for projects or activities provided for in the Departments of Labor, and Health, Education, and Welfare, and Related Agencies Appropriations Act, 1978 (H.R. 7555), at a rate of operations, and to the extent and in the manner, provided for in such Act, notwithstanding the provisions of Sec. 106 of this joint resolution: *Provided, That none of the funds provided for in this paragraph* shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.
>
> Nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy.
>
> The Secretary shall promptly issue regulations and establish procedures to ensure that the provisions of this section are rigorously enforced.

*Id.* (emphasis added).

There is nothing in the language of the proviso suggesting that Congress intended to repeal the Medicaid Act in part. The Hyde Amendment specifically addresses itself to the use of federal funds. The words are clear: "*Provided,* That none of the funds provided for in this paragraph . . ." The usual rule of statutory construction is to start with the words of the statute; if they are clear, there is no need to go further.

> When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning. *Ex parte Collett*, 337 U.S. 55, 61, [69 S.Ct. 944, 93 L.Ed. 1207] (1949), and cases cited therein. Here it is not *necessary* to look beyond the words of the statute. We have undertaken such an analysis only to meet Mr. Justice Powell's suggestion that the "absurd" result reached in this case, post, at 2302, is not in accord with congressional intent.

*TVA v. Hill*, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296, n.29, 57 L.Ed.2d 117 (1978).

Although my brethren recognize that the language of the Hyde Amendment speaks only to the use of federal funds, they feel that an extensive excursion into legislative history is necessary because its plain meaning produces a result at variance with the policy of the legislation as a whole. This is a bootstrap approach to statutory construction; it allows a court to ignore the plain language of a statute and rewrite it by drawing upon its legislative history. While congressional debates and committee reports can be a helpful guide to the intent of an ambiguously worded statute, they should not be used to defeat the clearly expressed statutory language. The majority opinion cites *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1939), in support of the doctrine that, when the plain meaning of a statute produces a result " 'plainly at variance with the policy of the legislation as a whole,' " it is necessary to delve into legislative history. But there is no "legislation as a whole" to consider here. We have an amendment attached to a general appropriations bill. This, of course, is a

prime example of why the courts should be and are extremely reluctant to allow a rider to an appropriations bill to amend an entirely separate and distinct statute by implication. *See* extended discussion in *TVA v. Hill, supra,* 437 U.S. at 189–193, 98 S.Ct. 2299–2301. Our own observation in *Mass. Fin. Serv. v. Securities Investor Protection,* 545 F.2d 754, 757–58 (1st Cir. 1976), cited in the majority opinion, is pertinent:

> It is not our province to decide whether Congress would have been wiser to draft the SIPC legislation so as to include firms like MFS as members, *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.,* 299 U.S. 183, 195–96, 57 S.Ct. 139, 81 L.Ed. 109 (1936), and it is no part of our function to extend a statute's reach beyond its clearly indicated scope. *Guiseppi v. Walling,* 144 F.2d 608, 614–15 (2d Cir. 1944) (Frank, J.) *aff'd sub nom. Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). Rather, "[i]t is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great Northern Ry.,* 343 U.S. 562, 575, 72 S.Ct. 985, 993, 96 L.Ed. 1142 (1952). Congress remains free to amend SIPA should it so choose, but as it now stands that act clearly exempts MFS.

But, even assuming that the legislative history is relevant, I can find nothing in the majority's excellently researched and documented history of the debate on this highly emotionally charged subject that clearly indicates that Congress was doing more than limiting the use of federal funds. There were, as my brethren point out, two separate statements, by Congressman Doran and Edwards, to the effect that only federal funds were involved. The majority concludes, however, that these observations were nullified by those portions of the debate in both the House and Senate that focused on the effect of the amendment on the poor, *i. e.,* by Congressman Stokes, Meyner, Sears and Fraser and Senators Packwood, McGovern, Bayh, Brooke and Javits. But the statements of Congressmen Doran and Edwards were never expressly refuted.

My brethren state that "the record is clear that both houses of Congress were acutely conscious that they were engaging in substantive legislation." If this is so, it is hard to understand the absence of any statement during the course of the lengthy debate that the Hyde Amendment was making a significant change in the Medicaid Act. Surely, someone in the Congress would have been perceptive enough and forthright enough to realize the full implications of the amendment and say so. It is not as clear to me as it is to my brethren that Congress intended a *pro tanto* amendment of the Medicaid Act. The majority opinion points to the absence from the debate of any discussion of the financial effects on the states of being forced to fund abortions that are determined to be medically necessary as further evidence of an intended substantive change in the Medicaid Act. It may also, of course, indicate that Congress was so emotionally enveloped in this volatile and disruptive subject that it failed to think through the implications of what it was doing. In any event, we cannot construe silence on a subject as a positive expression of congressional intent.[1]

We have here a statute whose plain meaning is clear and whose congressional history can be construed to mean that a number of congressmen felt that, contrary to what the statute said, it would effect a substantial change in the Medicaid Act. If this were merely a matter of balancing the words of the statute against the words of the debate, this would be a close case, but the principle disfavoring repeal by implication and Congress' own procedural rules expressly prohibiting changing existing law via an appropriations bill, apply with particular pertinence here and compel a finding that there was no substantive amendment of the Medicaid Act.

---

1. The suggestion in the majority opinion that funding by a state alone of medically necessary abortions could cripple a state's attempts to provide other necessary medical services in its plan is not buttressed by any facts or figures in the record or the congressional history.

The majority's attempt to distinguish this case from *TVA v. Hill, supra,* rests on the grounds that full-fledged and lengthy congressional debate is a better gauge of congressional intent than a committee report. As I noted before, however, the subject matter of the debate is an important factor to consider. It would not be inaccurate to say that the more emotional the subject, the less sure we can be that the words used reflect considered thought rather than expressing deeply ingrained feelings. I cannot, as does the majority, ignore the clear teaching of *TVA v. Hill, supra.*[2]

The doctrine disfavoring repeals by implication "applies with full vigor when . . . the subsequent legislation is an *appropriations* measure." *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971) (emphasis added); *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 355 (CA8 1972). This is perhaps an understatement since it would be more accurate to say that the policy applies with even greater force when the claimed repeal rests solely on an appropriations act. We recognize that both substantive enactments and appropriations measures are "acts of Congress," but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. Not only would this lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation, but it would flout the very rules

the Congress carefully adopted to avoid this need. House Rule XXI(2), for instance, specifically provides:

> "No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless in continuation of appropriations for such public works as are already in progress. *Nor shall any provision in any such bill or amendment thereto changing existing law be in order.*" (Emphasis added.)

See also Standing Rules of the Senate, Rule 16.4. Thus, to sustain petitioner's position, we would be obliged to assume that Congress meant to *pro tanto* repeal § 7 of the Act by means of a procedure expressly prohibited under the rules of Congress.

437 U.S. at 190–191, 98 S.Ct. at 2299.

The majority cites *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), to buttress its position that in rare cases where congressional intent is clear, an amendment to an appropriations bill may effect a change in existing law. In *Dickerson,* the Congress did amend a reenlistment allowance statute by a provision tacked on to an appropriation for the Rural Electrification Administration. But the language used in the appropriations rider specifically referred to the other statute and explicitly suspended its provisions for the fiscal year in question. *Dickerson* is, therefore, a very narrow exception to the established rule. Here, there is no clear amendment of the Medicaid Act in the appropriation proviso and, at the least, some ambiguity in the congressional history as to what Congress really intended.

I am also troubled by my brethren's treatment of what is to me a clear signal in *Beal v. Doe,* 432 U.S. 438, 444–45, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977):

> Although serious statutory questions might be presented if a state medicaid

---

**2.** *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), is merely the latest in a long line of cases holding that repeals by implication are not favored. *See, e. g., United States v. Continental Tuna Corp.,* 425 U.S. 164, 168–69, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976);

*Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 456–57, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *United States v. Borden Co.,* 308 U.S. 188, 198–99 (1939); *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936).

plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund *unnecessary* —though perhaps desirable—medical services.

I read this language as a cautionary instruction to the states that, while they would still be within the parameters of the Medicaid Act if they eliminated unnecessary medical services, they would transgress the statutory scheme by precluding necessary medical services from coverage. Which is precisely the situation we confront.

Another factor militating against the result reached by the majority is Congress' own rules. As pointed out in *TVA v. Hill, supra*, both houses of Congress have a rule that expressly prohibits changing existing law by an amendment to an appropriation bill. There is scant mention in the congressional debate of these rules or the fact that both houses intended to flout them.[3] Are we to assume that Congress deliberately evaded and ignored its own procedural rules, or forgot about them, or was entirely ignorant of them? The only logical conclusion that gives due deference to Congress' knowledge and respect for its own procedural requirements is that the Hyde Amendment was limited to the use of federal funds only.

The majority opinion focuses on the congressional debate and finds in it a clear intent to amend the Medicaid Act by allowing the states to limit necessary medical services for abortion to those specifically set forth in the Hyde Amendment.[4] This approach in my opinion distorts the picture. A complete perspective requires a careful look at all of the factors involved: the words of the statute, the congressional history, the rules of the Congress prohibiting substantive changes in existing law by an amendment to an appropriations bill, and the well established principle against repeal by implication, especially by an amendment to an appropriations bill.

Even if the congressional intent were as clear as the majority finds, I do not think that it should be allowed to ride roughshod over firmly established and, at least up until now, well understood congressional rules and judicial principles of statutory construction. I would hold that the Hyde Amendment is limited, as it clearly says, to the expenditure of federal funds and that the medically necessary requirements of the Medicaid Act still apply to the states. While the result may be "anomalous," that is a matter for Congress, not the courts. To quote again from *TVA v. Hill, supra,* 437 U.S. at 195, 98 S.Ct. at 2302:

We agree with the Court of Appeals that in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with "commonsense and the public weal." Our Constitution vests such responsibilities in the political Branches.

---

**3.** Senator Magnuson did state that the amendment should not be part of an appropriations bill, but did not advert to the Senate rule. Senator Stennis adverted, somewhat obliquely, to the "obscure rules" of the Senate.

**4.** As the majority points out, the requirement that the damage to the mother be limited to physical health, excluding any mental health damage, is directly contrary to the specific provisions of the Medicaid Act that medical services may not be denied "solely because of the diagnosis, type of illness or condition." 42 C.F.R. § 449.10(a)(5)(i) (1977) [recently recodified as 42 C.F.R. § 440.230, 43 Fed.Reg. No. 190 (Sept. 29, 1978)]. *See also* 42 U.S.C.

§ 1396a(a)(10)(A), (C). Rather than reading this language as a repeal by implication of the Medicaid Act, I would read "physical" as surplusage and strike it, leaving "health" standing alone. This construction would permit both statutes to be read in harmony one with the other. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974).