**Denise DOE et al., Plaintiffs,**

v.

**F. David MATHEWS, Secretary of Health, Education and Welfare, et al., Defendants.**

**Civ. A. No. 76–1835.**

United States District Court,
District of Columbia.

Oct. 2, 1976.

Roy Lucas, Washington, D. C., for plaintiffs.

Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., David J. Anderson, Glenn Whitaker and Rebecca L. Ross, Attys., U. S. Dept. of Justice, William H. Taft, IV, Gen. Counsel, Dept. of HEW, Donald Hirsch, Michael H. Cook, Sondra D. Stigen-Straubhaar, Attys., Dept. of HEW, Washington, D. C., for defendants.

## OPINION AND ORDER

SIRICA, District Judge.

This action has been brought by a number of women residents of the District of Columbia and Virginia, a doctor and a clinic to enjoin the Secretary of Health, Education and Welfare from complying with a provision of a federal appropriations statute. The provision, known as the Hyde Amendment, Labor-HEW Appropriations Act, Pub.L. No. 94–439, § 209 (Sept. 30, 1976), 90 Stat. 1418, prohibits the Secretary of Health, Education and Welfare ("HEW") from using any money appropriated to him for the fiscal year beginning October 1, 1976, "to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." This limitation would apply to funds appropriated for Medicaid, and, as persons eligible for Medicaid benefits or as recipients of Medicaid funds, the plaintiffs claim it is unconstitutional.

### I.

The operation of Medicaid is primarily governed by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (1970), *as amended,* (Supp. V., 1975), and by regulations promulgated thereunder. Basically, it is a system whereby the federal government undertakes to help the states and the District of Columbia[1] pay for the medical needs of their poor residents. To qualify for this aid, a jurisdiction must establish a medical assistance program to pay for a certain minimum number of medical services for its "categorically needy" residents. See 42 U.S.C. § 1396a(a)(13)(B) (1970); 45 C.F.R. § 249.10(a)(1) (1975). Beyond that, a jurisdiction can also obtain more federal aid if it wishes to pay for certain additional medical services for the categorically needy and other "medically needy" as well. See 42 U.S.C. § 1396a(a)(10)(B) (1970); 45 C.F.R. § 248.10(d)(1) (1975).

Both of the jurisdictions which are relevant in this case—the District of Columbia

---

1. Under D.C.Code § 1–267 (1973), the District of Columbia is authorized to set up a medical assistance program under Title XIX.

and Virginia—have chosen to set up medical assistance programs for their medically needy residents under Title XIX. Both, in their program plans that have been approved by HEW, have undertaken to pay for, among other things, impatient and outpatient hospital services, physician services administered in the hospital, office, home or elsewhere, clinic services, and family planning aid. See *Dep't of HEW, Medicaid Services State by State* (June 1, 1976). Both, in the past, have in general paid for abortions under these plans.

For its part, the federal government under Title XIX undertakes to reimburse participating jurisdictions for all the necessary medical expenses incurred in the administration of the local medical assistance program, but only to the extent of certain percentages, which vary depending on the service, and only to the extent of money appropriated by Congress for the purpose. 42 U.S.C. § 1396b (1970). As the system works in practice, the federal government every quarter makes advance payments to each participating jurisdiction. That payment is intended to approximate the expenses the particular jurisdiction will incur under its medical assistance program during that period. If the payment in fact exceeds or is less than the actual expenses incurred, an appropriate adjustment is made in the following quarter's advance. 45 C.F.R. § 201.5 (1975). On October 1, 1976, a new quarter began, and advance payments were presumably sent out at that time in accordance with the limitation imposed by the Hyde Amendment.

Seen in this light, the Hyde Amendment appears to be simply a limitation on the federal government's undertaking under Title XIX to reimburse the jurisdictions participating in the Medicaid program. And the limitation is a narrow one, for the legislative history of the Amendment makes clear that Congress only intended to prohibit payment for abortions done as a "method of family planning or for emotional or so-

cial convenience." H.R. (Conf.) Rep. No. 94–1555, 94th Cong., 2d Sess. 3 (1976).

## II.

This suit was filed on October 1, 1976, the day after Congress passed the Labor-HEW Appropriations Act over the President's veto, and the day the Act became effective. Joined as plaintiffs at the present time are six women,[2] a doctor who regularly performs abortions, and a clinic at which abortions are often performed.

Three of the female plaintiffs are now pregnant; as of October 8, 1976, one was six weeks, another seven weeks, and the third was twelve weeks pregnant. Each of these plaintiffs is a resident of the District of Columbia and is eligible for Medicaid benefits under the D.C. medical assistance program. Each would like to have an abortion either for emotional or social convenience or for family planning reasons, but claims that she may not be able to because the Hyde Amendment prevents the use of Medicaid funds for such abortions and because she may not be able to afford to pay for the operation herself.

The other female plaintiffs have already had abortions, all for emotional or social convenience or for family planning reasons; all had them on September 23, 1976. These women were between five and seven weeks pregnant at the time the operations were performed. Two of them are residents of the District of Columbia and one is a resident of Virginia. Each is eligible for Medicaid under her local medical assistance program, but none has yet received notice that her abortion was paid for through that program. These plaintiffs concede that this in itself does not mean much, however, since the local medical programs normally take six to eight weeks to pay for the medical services rendered under Medicaid. But nevertheless, they claim that, since their reasons for having the abortions would not permit federal funds to be spent on their abortions, the local medical assistance pro-

---

**2.** Three woman who have not yet had abortions moved to intervene as plaintiffs shortly after suit was instituted. Since the government does not oppose this, leave to intervene is hereby granted.

grams will not pay for their operations. These plaintiffs have not alleged, however, that each will be personally liable for the cost of her abortion if the local jurisdiction does not pay for it.

The seventh plaintiff is Milan Vuitch, M.D. He has performed and supervised abortions in the past on women eligible for Medicaid and would like to continue to do so in the future. The plaintiff Laurel Clinic, Inc., is an abortion clinic of which Dr. Vuitch is the medical director. The abortions that have already been performed on the female plaintiffs in this case have been done by Dr. Vuitch or under his supervision at the Laurel Clinic. Neither Dr. Vuitch nor the clinic has yet been paid for the three abortions that have been performed and, they claim, neither will be paid.

All of the plaintiffs made the same basic claim, namely, that the Hyde Amendment impermissibly burdens the right of the female plaintiffs to exercise their fundamental right under *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to decide for themselves, in consultation with their physicians, whether or not to have abortions, and unreasonably discriminates against the exercise of that right by continuing to allow federal funds to be spent for other medical services and for childbirth care. This, they claim, violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution.[3]

To obtain relief, the plaintiffs have sued the Secretary of HEW, who is the one in control of the federal funds appropriated for disbursement under Medicaid, to obtain an injunction preventing him from limiting his disbursements as provided in the Hyde Amendment.[4]

On October 1, 1976, Judge Waddy issued a temporary restraining order to preserve the status quo in this case until a hearing could be held. On October 12, 1976, this Court held a hearing on the plaintiffs' motion for a preliminary injunction and extended the temporary order for nine days so that it could consider the arguments of the parties. The Court has carefully considered the arguments made and the memoranda filed by all parties and concludes that the order must be dissolved.

### III.

In addressing the issues raised in this case, the Court is not called upon to determine whether abortions performed during the first six months of pregnancy or at any time, are or are not proper; it has simply been asked to decide what the federal law on this subject is. But the Court has concluded that it cannot answer even this limited question, since, in its view, the plaintiffs have not alleged a "case or controversy" over which this Court is permitted, under Article III of the Constitution, to exercise jurisdiction.

### A.

■ The policies that a court must consider in determining whether a party has presented a justiciable "case or controversy" have until recently been somewhat unclear. For some years, the principal focus of attention was on whether the plaintiff had alleged an injury of such dimension, of such imminence, and of such a personal nature as to assure the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

Recent Supreme Court cases have indicated that a second and overriding policy

---

**3.** The plaintiffs have not explicitly limited their claims to any of the trimesters of pregnancy. It does not appear, however, that abortions can legally be performed in the District of Columbia or Virginia during the final trimester of pregnancy except under conditions which the federal government would in any event continue to support even under the Hyde Amendment. The Court will presume that the plaintiffs wish to limit their claims to persons six months pregnant or less.

**4.** A number of persons have sought to intervene as defendants. Given the disposition of this case, the Court need not address these motions.

must also be considered. That policy is to insure that a court stays within the bounds placed on it by the constitutional scheme of the separation of powers. The focus of this inquiry is on the relief which the court is able to give and on the effectiveness of that relief in given circumstances.

To date, the cases which have specifically dealt with this second policy have been concerned with the standing aspect of jurisdiction under Article III. E. g., *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Singleton v. Wulff,* —— U.S. ——, ——, 96 S.Ct. 2868, 2879, 49 L.Ed.2d 826, 839 n. 3 (1976) (Powell, J., concurring and dissenting). These cases make clear that before a court may exercise jurisdiction, the plaintiff must show to a "substantial likelihood" that if he is victorious in the suit and relief is granted, he will not suffer the injury he fears. *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 45, 96 S.Ct. at 1928, 48 L.Ed.2d at 465.

Without a doubt, a similar inquiry must be made with regard to the ripeness aspect of jurisdiction under Article III. If that is so, then a plaintiff must also show to a "substantial likelihood" that if relief is denied, he will in fact suffer the injury he fears. This is precisely the thrust of the Supreme Court's recent discussions on ripeness in *O'Shea v. Littleton,* 414 U.S. 488, 493–99, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 570 (1976).

### B.

As noted in Part II above, the interest which the plaintiffs here claim is being or will be injured is that of the freedom of these women to decide for themselves, in consultation with their physicians, whether or not to have abortions. The injury they claim is that the Hyde Amendment will prevent the use of federal Medicaid funds to pay for their abortions and that this will prevent the District of Columbia and Virginia from providing any funds under their medical assistance programs for their abortions; physicians, in turn, will then refuse to perform abortions on them unless they promise to pay for the operations themselves. This, they claim, will burden or perhaps deny altogether their freedom of choice on whether or not to have abortions; and, given the fact that other medical services and also childbirth care will continue to be available, this works a discrimination against them in the exercise of that freedom.

The Court may assume for the sake of argument that, if an injury is imminent, at least those plaintiffs who are still pregnant have standing to sue to prevent it. But the Court does not believe that the injury those plaintiffs allege is in fact imminent enough to present the requisite "case or controversy."

The most troublesome link in the plaintiffs' chain of causation is the allegation that both the District of Columbia and Virginia will refuse to pay for those abortions for which the federal government will not reimburse them. The Court specifically asked counsel for the plaintiffs about this link at the oral hearing. Transcript at 10, 33. Counsel was unable at that time to answer the Court's questions satisfactorily, and the Court gave plaintiffs five additional days in which to submit additional argument on this point. Subsequently, they submitted a number of statements of officials of various states, but not of Virginia or the District of Columbia. One, a Maryland official, states that that state has no plans to pick up the cost of abortions such as are at issue here should the Hyde Amendment go into effect. An official from Georgia says that it is "very unlikely" that it will be able to absorb the added costs of paying for such abortions completely on its own. A Dr. Baird of Minnesota states that, in his opinion, he has no authority to disburse funds for abortions solely out of state funds. State officials in California, Colorado and South Carolina say much the same thing.

The plaintiffs also allege that in Texas the state constitution forbids grants for

medical care when federal matching funds are unavailable.

None of these statements, it should be noted, purports to be a binding statement on the legal obligations of the state by an official or body authorized to make such statements.

The relevance of all this to this case presumably is that officials in the District of Columbia and Virgina would say something similar. But the Court can hardly infer from these statements that there is a "substantial likelihood" that the District of Columbia and Virginia will withhold payments to the plaintiffs.

However, even if the Court took a more favorable view of these statements than it does, and accepted as proven that the relevant jurisdictions will refuse to make the payments themselves, this would not wholly answer the question. For, as indicated in Part I above, both the District of Columbia and Virginia have undertaken, under their local plans, to pay for abortions in situations such as are contemplated in this case. Until amended, these plans continue in force and no change is authorized in the level of services which must be provided. 45 C.F.R. § 201.3 (1975). Nor can the level of services called for in the plans be reduced before recipients are given "timely and adequate" notice of the change. 45 C.F.R. § 206.10(a)(7) (1975). Since it does not appear that the District or Virginia has either moved to amend its plan or taken "proposed action to discontinue, terminate, suspend or reduce assistance" related to the treatment of pregnancy, *id.*, they may well be *legally obligated* to continue to pay for these abortions under their Medicaid plans.

Nor have the plaintiffs alleged that the District of Columbia and Virginia are free to discontinue paying for abortions under Title XIX. In *Doe v. Beal,* 523 F.2d 611 (3d Cir. 1975) (en banc), *cert. granted,* —— U.S. ——, 96 S.Ct. 3220, 49 L.Ed.2d 1216 (1976), the Court of Appeals for the Third Circuit held that Title XIX commands the states to fund abortions in situations where, as here, the jurisdiction has decided to pay for the health care of women who elect to give birth to a child. True, *Beal* was decided before the Hyde Amendment became effective. But the effect of this provision on that case may not be significant, especially since Title XIX only binds the federal government to reimburse the states "[f]rom the sums appropriated therefor." 42 U.S.C. § 1396b(a) (1970). A state, then, may have assumed the risk, in setting up its medical assistance program, of in fact paying for a somewhat greater share of the cost of the program than it might have originally anticipated. Certainly, plaintiffs have made no showing to the contrary.

Finally, the plaintiffs have failed to suggest that Virginia and the District of Columbia are free to refuse to pay for these abortions under the U.S. Constitution. Several courts have held that the states participating in the Medicaid program are under a general constitutional obligation to fund abortions on an equal basis with other medical care and with childbirth care. *Roe v. Norton,* 408 F.Supp. 660 (D.Conn.1975), *prob. juris. noted sub nom. Maher v. Roe,* —— U.S. ——, 96 S.Ct. 3219, 49 L.Ed.2d 1216 (1976); *Doe v. Rampton,* 366 F.Supp. 189 (D.Utah 1973). True again, these cases were decided before the Hyde Amendment became effective, but again, it is not clear that this would change the result in those cases either.

Despite all these contingencies, the plaintiffs have nevertheless suggested that, whatever the District of Columbia and Virginia may do, and whatever they may be obligated to do, the fact remains that physicians are not now likely to perform abortions for women such as those in this case because of fears that these jurisdictions would not reimburse them for the operations. But for all that appears on the record, this may simply be because the physicians are ignorant of how the Medicaid system works and of what the legal obligations of the District of Columbia and Virginia might be.

In sum, the plaintiffs simply have not shown that if relief is denied in this case they will suffer an injury of any substance whatsoever. The Court therefore concludes

that the plaintiffs have not alleged a ripe "case or controversy" over which this Court can constitutionally exercise jurisdiction.

## IV.

For all of the above reasons, the Court also holds that the plaintiffs have not alleged that the injury they fear is so imminent as to require the exercise of the Court's equity jurisdiction. See *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). But one additional consideration bolsters this determination. It is a matter of strict federal policy that courts avoid deciding questions of federal constitutional law when it is reasonably possible that an alternative nonconstitutional ground exists for reaching the same result. *Ashwander v. TVA*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936). Cf. *Singleton v. Wulff*, —— U.S. ——, ——, ——, 96 S.Ct. 2868, 2873–2874, 2879, 49 L.Ed.2d 826, 833, 839 n.3 (1976). This principle applies in this case. As indicated in Part IIIB above, there is a fair possibility that a court can avoid deciding the difficult question of whether the federal government can constitutionally refuse to contribute to the performance of certain abortions by construing local medical assistance plans or a federal statute. Of course, this Court does not have the power in this case to indicate whether in fact that constitutional issue can be avoided or not. But since the plaintiffs here can be left to that recourse without any apparent injury to them, this Court finds that, as a matter of equity jurisdiction also, this case should be dismissed. See *O'Shea v. Littleton, supra.*

## V.

For the reasons indicated above, it is this 21st day of October, 1976,

ORDERED that this action be, and the same hereby is, dismissed for lack of jurisdiction.