Michael **FRIEMAN**, M. D., et al., Plaintiffs,

v.

James F. **WALSH** et al., Defendants.

No. 77 4171 CV C.

United States District Court, W. D. Missouri, C. D.

Jan. 26, 1979.

Michael Boicourt, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## OPINION AND ORDER

ELMO B. HUNTER, District Judge.

The State of Missouri, by statutory and regulatory law,[1] has taken the position that no public funds are to be spent on abortions unless "the attending physician in the exercise of his best clinical, medical judgment believes a full-term pregnancy and childbirth would cause cessation of the mother's life."[2]

Plaintiffs Freiman and Duemler (medical doctors actively engaged in the medical practice of obstetrics and gynecology in the St. Louis area) and plaintiff Reproductive Health Services (a Missouri not-for-profit corporation which operates and maintains an out-patient, first-trimester abortion facility) state that they presently provide and perform pregnancy termination procedures to numerous patients who are eligible for Missouri medicaid assistance. Plaintiffs contend that the vast majority of these abortions were medically necessary and medically indicated in light of all factors which plaintiffs feel, in their professional, medical judgment, are relevant to the patients' well-being: physical, emotional, psychological, familial, and the woman's age. Plaintiffs further assert that "the performance of an abortion as necessary to prevent cessation of the patient's life is not today a medical reality."

Based on these and other facts alleged in their Complaint, plaintiffs state that the above-quoted regulation should be declared violative of the United States Constitution and ask that this Court issue appropriate Orders restraining defendants from enforcing it.

Specifically, plaintiffs contend that the regulation:

Frank Susman, St. Louis, Mo., for plaintiffs.

---

1. By statute, Missouri has provided that no Medicaid funds are to be expended for abortions "unless such abortions are medically indicated." R.S. Mo. § 208.152(13). By regulation, the State has declared that " '[m]edically indicated' shall mean where the attending physi- cian in the exercise of his best clinical, medical judgment believes a full-term pregnancy and childbirth would cause cessation of the mother's life." 13 C.S.R. § 40–81.100.2.

2. 13 C.S.R. § 40–81.100.2.

(a) denies to plaintiffs and their patients due process and equal protection of the laws;

(b) is unconstitutionally vague and uncertain on its face, in violation of the Fourteenth Amendment;

(c) deprives plaintiffs and their patients of the right to privacy in the physician-patient relationship, "as protected by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution";

(d) deprives plaintiffs of the right to practice medicine according to the highest standards of medical practice, "as guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution";

(e) deprives plaintiffs' patients of their fundamental right to determine whether to bear children;

(f) deprives plaintiffs' patients of their right to receive safe and adequate medical advice and treatment pertaining to whether to carry a given pregnancy to term and the method of termination;

(g) imposes a cruel and unusual punishment upon indigent Missouri medicaid eligible women by forcing and coercing them to bear each pregnancy they conceive; and

(h) bears no rational relationship to any legitimate state interest.

Also at issue is whether the Missouri laws here at issue are violative of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., (the Medicaid Act).

▮ Whether and to what extent the various levels of government should fund abortions is a hotly debated issue, rife with social and religious implications. A resolution of that issue is, however, beyond the competence of this Court. Those who would insist upon a judicial resolution of such an issue simply "misconceive . . . the role of the judiciary." *Beal v. Doe*, 432 U.S. 438, 447, 97 S.Ct. 2366, 2373, 53 L.Ed.2d 464, 474, fn. 15 (1978).[3]

Accordingly, the issues before this Court are legal in nature and narrow in scope; the policy decisions have been and will be made elsewhere.

With this in mind, a resolution of the issues presented to the Court by this cause will now be made.

## I

## DOES MISSOURI LAW CONTRAVENE TITLE XIX OF THE SOCIAL SECURITY ACT?

Title XIX of the Social Security Act,[4] which establishes the Medicaid Program, creates a framework whereby participating states,[5] with the aid of federal funds, provide medical services to certain needy persons. A state need not participate in the Medicaid program, but once it chooses to do so, it must comply with applicable federal law.

While the Medicaid program gives states broad discretion in adopting standards for determining the extent of medical assistance to be provided, this discretion is not unfettered: the standards must be "reasonable" and "consistent with the objectives" of the Act. 42 U.S.C. § 1396a(a)(17). Further, the regulations promulgated by the Secretary of Health, Education and Welfare pursuant to Title XIX provide that a state which participates in the Medicaid program "may not arbitrarily deny or reduce the amount, duration, or scope of, such

---

**3.** After ruling that neither Title XIX nor the Equal Protection Clause requires that states fund elective abortions, the Supreme Court, in *Beal v. Doe*, supra, at 448, fn. 15, 97 S.Ct. at 2373, 53 L.Ed.2d at 474, concluded:

"But we leave entirely free both the Federal Government and the States, through the normal processes of democracy, to provide the desired funding. *The issues present policy decisions of the widest concern. They should be resolved by the representatives of the people, not by this Court.*" [emphasis added]

**4.** 42 U.S.C. §§ 1396 et seq.

**5.** Missouri is a participating state. *See* R.S. Mo. § 208.151 et seq.

services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition." 42 C.F.R. § 449.-10(a)(5)(i).

The State of Missouri has drawn to this Court's attention no other illness or condition where the attending physician must certify, as a prerequisite to his patient's qualifying for Medicaid assistance, that nontreatment of the illness or condition would "cause cessation of the [patient's] life." As the Court stated in *Preterm, Inc. v. Dukakis*, 591 F.2d 121 at 126 (1st Cir. 1979):

> "When a state singles out one particular medical condition—here, a medically complicated pregnancy—and restricts treatment for that condition to life and death situations it has, we believe, crossed the line between permissible discrimination based on degree of need and entered into forbidden discrimination based on medical condition.
>
> \* \* \* \* \* \*
>
> "We find it 'unreasonable' and wholly '[in]consistent with the objectives of the Act', 42 U.S.C. § 1396a(a)(17), for a state to provide abortion services and then, with limited exceptions for victims of rape and incest,[6] deny it to all those who will not die without it. We know of no other instance where a legislative decision to pay for medical care is based on the distinction between life and death."

Plaintiffs, therefore, must prevail on their claim that the State of Missouri has, in limiting public funding of abortions to those instances where "a full-term pregnancy and childbirth would cause cessation of the mother's life," transgressed the dictates of Title XIX and the regulations promulgated thereunder.

## II

## RELIEF

■ As plaintiffs request the issuance of a declaratory judgment and a permanent injunction restraining the enforcement of the state laws in question, this Court must be guided by and apply equitable principles in formulating the appropriate remedy.[7]

To order the State of Missouri to fund all abortions of needy persons where the attending physician certifies that the abortion is "medically necessary" would be, in view of the Hyde Amendment, highly inequitable —or, as Judge Caffrey put the matter—"it would be anomalous." *Jaffe v. Sharp*, 463 F.Supp. 222 at 230 (D.Mass.1978), affirmed in part, remanded in part, sub nom. *Preterm, Inc. v. Dukakis*, supra.

The Hyde Amendment, Section 101 of Pub.L. 95–205, 91 Stat. 1460 (the appropriations act for the Department of Health, Education and Welfare for fiscal year 1978),[8] provides:

> "[N]one of the funds provided for in this paragraph shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest ha[ve] been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to

6. Missouri does not even allow for these exceptions.

7. In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 155, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681, 695 (1967), the Supreme Court noted that "the declaratory judgment and injunctive remedies are equitable in nature . . ." As the Second Circuit stated in *Holup v. Gates*, 544 F.2d 82, 85, fn. 3 (1976): "The granting of declaratory relief is governed by equitable principles, . . . and within the sound discretion of the reviewing court."

8. It should be noted that the "Hyde Amendment" at issue in *Doe v. Mathews* was Section 209 of Pub.L.No. 94–439, 90 Stat. 1418, the predecessor to the current Hyde Amendment. The former Hyde Amendment differs from the current one in that the former prohibited the use of federal funds "to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."

term when so determined by two physicians."

Plaintiffs argue that "the impact of the Hyde Amendment has been merely to withdraw federal funding contributions from the costs of those abortions still required to be performed under state Medicaid programs (i. e., medically necessary abortions). The costs of such abortions must be met 100% by the state itself, as a condition of state participation in and federal funding by Medicaid generally."

Plaintiffs' view of the Hyde Amendment and its effect on state obligations under Medicaid has received support in some of the cases. For instance, in *Doe v. Mathews*, 422 F.Supp. 141 (D.D.C.1976), the Court, at 143, 146, stated:

"[T]he Hyde Amendment appears to be simply a limitation on the federal government's undertaking under Title XIX to reimburse the jurisdictions participating in the Medicaid program.

\* \* \* \* \* \*

". . . Title XIX only binds the federal government to reimburse the states '[f]rom the sums appropriated therefor.' 42 U.S.C. § 1396b(a) (1970). A state, then, may have assumed the risk, in setting up its medical assistance program, of in fact paying for a somewhat greater share of the cost of the program than it might have originally anticipated." [9]

The District Court in *Zbaraz v. Quern*, No. 77–C–4522, slip op. at 12 (May 15, 1978) (appeal pending before Seventh Circuit), quickly dismissed the argument that the Hyde Amendment affects obligations imposed by Title XIX with the observation: "Limitations on the use of funds in an appropriations bill will not suspend statutory obligations."

Plaintiffs position was rejected, however, by the First Circuit in *Preterm, Inc. v. Dukakis*, supra, where the majority, after an extensive review of the Congressional debates, concluded that "the Hyde Amendment was intended as more than a cost-shifting device." Id., at 134. At 134 the majority held:

"that the legislative history of the Hyde Amendment is consistent with the cooperative federal-state structure of the Medicaid Act and reveals that the Amendment constituted a substantive policy decision concerning the public funding of abortions which left the states free to fund more abortions than those for which federal funds were made available by the Amendment, but did not require them to do so. The Medicaid Act, to the extent of its repugnancy with the Hyde Amendment, has therefore been altered by the Amendment."

■ After a careful review of the applicable law, this Court is of the opinion that the Hyde Amendment, *even when viewed purely as an appropriations act*, does *not* cause there to be imposed upon participating states the burden of providing 100% of the funding for all medically necessary abortions for which federal reimbursement is precluded by the Amendment. In arriving at this conclusion, this Court necessarily disagrees with the proposition that a state "assume[s] the risk, in setting up its medical assistance program, of in fact paying for a somewhat greater share of the cost of the program than it might have originally anticipated." *Doe v. Mathews*, supra, at 146. Just as "Title XIX only binds the federal government to reimburse the states '[f]rom the sums appropriated therefor.' 42 U.S.C. § 1396b(a) (1970)," Id., at 146, Title XIX, in this Court's judgment, only binds the states to fund those medical procedures for which it will be reimbursed in accordance with the sharing formula set out in Title XIX. See 42 U.S.C. § 1396b(a) and § 1396d(b).[10]

---

**9.** It should be noted that the "Hyde Amendment" at issue in *Doe v. Mathews* was Section 209 of Pub.L.No. 94–439, 90 Stat. 1418, the predecessor to the current Hyde Amendment. The former Hyde Amendment differs from the current one in that the former permitted the use of federal funds to perform abortions *only* "where the life of the mother would be endangered if the fetus were carried to term."

**10.** 42 U.S.C. § 1396d(b) provides, in part:

"The term 'Federal medical assistance percentage' for any State shall be 100 per centum less the State percentage; and the State

Viewed purely as an appropriations act (as plaintiffs argue it should be viewed), the Hyde Amendment can have no effect whatsoever on the rights conferred upon the participating states by the substantive sharing provisions of Title XIX. Just as Title XIX imposes upon the States a great many obligations, so does it confer upon them certain rights and protections.

While addressing the matter from a dramatically different approach than does this Court, the First Circuit emphasized, as does this Court, that the Federal-State fiscal partnership is the most fundamental aspect of the Medicaid program. In *Preterm, Inc. v. Dukakis,* supra, at 132, the Court stated:

"[We do not embrace plaintiffs'] reading of the [Hyde] Amendment as a mere withdrawal of federal monies. Although that reading may permit the Hyde Amendment and the Medicaid Act to co-exist facially by effecting no change in the Act's requirements for state plans, it requires us to do violence to the Medicaid Act on a more pervasive and fundamental level than would result from reading the Amendment as a substantive alteration of those requirements. The Medicaid program is one of federal and state cooperation in funding medical assistance; a complete withdrawal of the federal prop in the system with the intent to drop the total cost of providing the service upon the states, runs *directly counter to the basic structure of the program* and could seriously cripple a state's attempts to provide other necessary medical services embraced by its plan." [emphasis added; footnote omitted]

percentage shall be that percentage which bears the same ratio to 45 per centum as the square of the per capita income of such State bears to the square of the per capita income of the continental United States . . . except that (1) the Federal medical assistance percentage shall in no case be less than 50 per centum or more than 83 per centum, . . ."

11. The parties have stipulated that prior to the enactment of the various Hyde Amendments, "the federal government's contribution to the State of Missouri for medicaid reimbursement for abortions was in some instances on a federal to state ratio of 90:10 percent when the same

The First Circuit also cites that portion of *McRae v. Mathews,* 421 F.Supp. 533, 538 (E.D.N.Y.1976), vacated and remanded on other grounds, sub nom. *Califano v. McRae,* 433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103 (1977), wherein Judge Dooling rejected the argument that the Hyde Amendment for Fiscal Year 1977 had not altered a state's obligation to fund abortions otherwise required to be funded under the Medicaid Act because:

"The argument overlooks the essential nature of the Medicaid legislation. The state and federal government are linked in a fiscal partnership to provide for medical assistance to the needy; the program is based on the federal initiative, and the funding is primarily federal (42 U.S.C. §§ 1396, 1396d(b))." [11]

While Congress might choose to amend the substantive sharing formula set forth in § 1396d(b) and while a state which chose to participate in the Medicaid program would be bound by that new sharing formula, no argument has been made—nor could such an argument be made—that Congress, through the Hyde Amendment, intended to effect an alteration of the substantive sharing formula set forth in § 1396d(b).

Thus, while plaintiffs prevail on the merits of this cause, the relief afforded will be limited in nature; that is, while the Missouri statutory and regulatory laws limiting public funding of abortions are violative of Title XIX, this Court views the applicable federal law as requiring that Missouri fund abortions for the needy only

were considered as part of the family planning program and in some instances on a federal to state ratio of approximately 60:40 percent when the same were considered as part of the regular medical assistance program.

"It is the belief of all parties that the federal government no longer considers any abortions, even those qualifying under the 'Hyde Amendment' provisions, to be reimbursable under the family planning program ratio and that all abortions, if any, are reimburseable only under the regular medical assistance program in its present ratio for Missouri of 60:66:39.34 percent."

insofar as it will receive reimbursement therefor pursuant to the substantive sharing formula set forth in the Medicaid statute. To the extent that the Hyde Amendment withdraws federal funding of Medicaid abortions, Missouri is thereby relieved of its burden to contribute its share to fund such abortions.

Nor does this Court believe that the Missouri laws here in question, when thus made consistent with the Hyde Amendment, run afoul of the Constitution.

 In applying Equal Protection analysis to the facts of this case, it should be initially observed that

"The Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents. But when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations."

*Maher v. Roe,* 432 U.S. 464, 469–470, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484, 492 (1977). Further, strict judicial scrutiny will be applied to governmental classifications where the classification "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16, 33 (1973). If no suspect class or fundamental Constitutional right is involved, the classification in question "must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *San Antonio School District v. Rodriguez,* supra, at 17, 93 S.Ct. at 1288, 36 L.Ed.2d at 33.

 Clearly, the Missouri scheme, as made consistent with the Hyde Amendment, does not operate to the disadvantage of some suspect class, for the Supreme Court "has never held that financial need alone identifies a suspect class for purposes

of equal protection analysis." *Maher v. Roe,* supra, 432 U.S. at 471, 97 S.Ct. at 2381, 53 L.Ed.2d at 492–93. Whether that scheme "impinges on a fundamental right explicitly or implicitly protected by the Constitution" is a closer question.

Plaintiffs rely on, *inter alia, Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) to support their position that a state which will fund the childbirth expenses of an indigent but not the expenses of certain therapeutic abortions impinges on a fundamental right explicitly or implicitly protected by the Constitution. These cases are not applicable to the one now before this Court, however. As the Court in *Maher v. Roe,* supra, observed 432 U.S. at 474, fn. 8, 97 S.Ct. at 2383 fn. 8, 53 L.Ed.2d at 495:

"But the claim here is that the State 'penalizes' the woman's decision to have an abortion by refusing to pay for it. *Shapiro* and *Maricopa County* did not hold that States would penalize the right to travel interstate by refusing to pay the bus fares of the indigent travelers. We find no support in the right to travel cases for the view that Connecticut must show a compelling interest for its decision not to fund elective abortions."

At 475–76, 97 S.Ct. at 2383, 53 L.Ed.2d at 495–96, the Court in *Maher v. Roe,* supra, emphasized:

"There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader."

 Plaintiffs also place reliance upon the Supreme Court's 1973 decisions *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201. It is, of course, true

that the Supreme Court "has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution," and that "[t]his right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, supra, 410 U.S. at 152, 153, 93 S.Ct. at 726, 727, 35 L.Ed.2d at 176, 177. But again, the Court in *Roe v. Wade* was concerned with "[t]he detriment that the State would impose upon the pregnant woman by denying this choice altogether," a matter wholly distinct from the issue now facing this Court. As the Court explained in *Maher v. Roe*, supra, 432 U.S. at 473–474, 97 S.Ct. at 2382, 53 L.Ed.2d at 494:

> "[T]he right in *Roe v. Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it. *Roe* did not declare an unqualified 'constitutional right to an abortion,' as the District Court seemed to think. Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. It implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds."

▉ Just as the Supreme Court in *Maher v. Roe* concluded that "the Connecticut regulation does not impinge upon the fundamental right recognized in *Roe [v. Wade]*," Id., at 474, 97 S.Ct. at 2383, 53 L.Ed.2d at 495, so too must this Court conclude that the Missouri scheme here at issue (as construed consistently with the dictates of the Hyde Amendment) fails to impinge on the fundamental privacy right recognized in *Roe v. Wade*.

Accordingly, for plaintiffs to prevail on their Equal Protection claim, they must demonstrate that the Missouri scheme (as construed to be consistent with the Hyde Amendment) fails to rationally further some legitimate state objective. *San Antonio School District v. Rodriguez*, supra, 411 U.S. at 17, 93 S.Ct. at 1288, 36 L.Ed.2d at 33. This plaintiffs have failed to do.

▉ As the Supreme Court has noted, a state may have a "strong and legitimate interest in encouraging normal childbirth." *Beal v. Doe*, supra, 432 U.S. at 446, 97 S.Ct. at 2372, 53 L.Ed.2d at 473, *Maher v. Roe*, supra, 432 U.S. at 478, 97 S.Ct. at 2385, 53 L.Ed.2d at 497. The State has a "strong interest in protecting the potential life of the fetus," and "[t]hat interest exists throughout the pregnancy, 'grow[ing] in substantiality as the woman approaches term.'" *Maher v. Roe*, supra, at 478, 97 S.Ct. at 2385, 53 L.Ed.2d at 497 (quoting from *Roe v. Wade*, supra). The Court further observed in *Maher v. Roe*, supra, at 478, fn. 11, 97 S.Ct. at 2385 fn. 11, 53 L.Ed.2d at 497:

> "In addition to the direct interest in protecting the fetus, a State may have legitimate demographic concerns about its rate of population growth. Such concerns are basic to the future of the State and in some circumstances could constitute a substantial reason for departure from a position of neutrality between abortion and childbirth."

That Missouri has a long history of favoring childbirth over abortion is clear. That this is a legitimate, constitutionally permissible stance is beyond dispute. That the Missouri scheme here at issue (as made consistent with the Hyde Amendment) rationally furthers this legitimate goal is likewise clear. Consequently, the conclusion is compelled that the Missouri scheme, as modified, does not transgress the Equal Protection Clause of the Fourteenth Amendment.

That this result is the proper one receives further support from *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), reversing *Doe v. Poelker*, 515 F.2d 541 (8th Cir. 1975). In that case, plaintiff had been denied an abortion at a city-owned hospital in St. Louis, Missouri as the result of a policy directive by the Mayor and a longstanding staffing practice at the hospital involved. "The directive, communicated to the Director of Health and Hospitals by the Mayor, prohibited the performance of abortions in the city hospitals

except when there was a threat of grave physiological injury or death to the mother." *Poelker v. Doe*, supra, 432 U.S. at 520, 97 S.Ct. at 2392, 53 L.Ed.2d at 530 [emphasis added]. The plaintiff in that case "was suffering from cervical fibroid tumors and polyps, an extremely retroverted uterus and trichomycosis," *Doe v. Poelker*, supra, at 543, but "none of [the students and doctors who saw her at the clinic] found any 'medical reasons' to justify an abortion, defining such reasons as severe sickness of the patient such as 'severe diabetes,' 'severe heart condition' or 'something of that type.'" Id., at 543.

The Supreme Court labeled those abortions which the policy directive of the Mayor prohibited (i. e., those abortions which were *not* necessary to save the life of the mother or to prevent grave physiological injury) as "elective," *see* 432 U.S. at 520, 97 S.Ct. at 2392, 53 L.Ed.2d at 530, or "nontherapeutic," Id., at 521, 97 S.Ct. at 2392, 53 L.Ed.2d at 531, and concluded, at 521, 97 S.Ct. at 2392–2393, 53 L.Ed.2d at 531:

> "For the reasons set forth in [*Maher v. Roe*, supra], we find no constitutional violation by the city of St. Louis in electing, as a policy choice, to provide publicly financed hospital services for childbirth without providing corresponding services for nontherapeutic abortions.
>
> \* \* \* \* \* \*
>
> "[The Mayor's] policy of denying city funds for abortions such as that desired by Doe is subject to public debate and approval or disapproval at the polls. We merely hold, for the reasons stated in *Maher*, that the Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth *as St. Louis has done.*" [emphasis added]

The same result on the Constitutional issue was reached by Judge Gordon in *Doe v. Mundy*, 441 F.Supp. 447 (E.D.Wis.1977), appeal dismissed (7th Cir. 1978). In that case, the Court was faced with a County Hospital's rule that provided, in part, that "[p]regnancy may be terminated therapeutically if it is complicated by medical conditions of such nature and advanced to such degree that continuation of pregnancy threatens the life of the mother." Judge Gordon, after carefully examining the recent Supreme Court cases on abortion, concluded, at 452:

> " . . . *Beal, Maher,* and *Poelker* declared no constitutional violation in the failure to provide funding for medically necessary abortions.
>
> "It follows that the county may choose to fund the medical aspects of childbirth and decline to fund the performance of any abortion which is not required because of a threat to a woman's life imposed by continuation of her pregnancy. Accordingly, I find that the plaintiffs cannot prevail on the merits of their claims that rule 26(b) and resolutions A and B violate the due process or equal protection clauses. The decisions in *Maher* and *Poelker* appear to me inescapably to foreclose these claims."

The District Court in *D. R. v. Mitchell*, 456 F.Supp. 609 (D.Utah 1978) reached the same result. It was the opinion of that Court that there was a fundamental distinction drawn by the Supreme Court in its 1977 abortion decisions between a State's prohibiting the performance of certain abortions and a State's refusal to provide funding for certain abortions while simultaneously funding childbirth expenses. As the District Court concluded, at 615:

> "Persons in this country have many rights which they may exercise freely in the sense that a government cannot prohibit the exercise of the respective rights. This does not mean, however, that the government has a corresponding duty to *fund* the exercise of that right. Likewise, the state's refusal to pay for the exercise of the right does not limit, penalize or prohibit the exercise of that right *in the constitutional sense.* . . . It is the opinion of this court that the failure to distinguish these concepts would make the Constitution 'a mandate for governmental interference, rather than a bulwark against it.'" [first emphasis in the original, second emphasis supplied by this Court; citations omitted]

In summary, this Court holds that it is not violative of the Equal Protection Clause for a state to pay for an indigent's childbirth expenses while refusing to fund the expenses incurred by an indigent to obtain an abortion "except when the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest have been reported promptly to a law enforcement agency or public health service, or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians."

The Court has considered plaintiffs' remaining Constitutional arguments and is firmly convinced that they, too, should be denied.

## III

### ORDER

For the reasons above-stated, this Court must declare the Missouri regulation here at issue to be contrary to the federal Medicaid Act (Title XIX of the Social Security Act), 42 U.S.C. §§ 1396, et seq. Further, the Court must, and it hereby does, enjoin defendants from enforcing the aforesaid regulation except insofar as it is consistent with the language of the current Hyde Amendment. Defendants are further ordered to provide funding for all abortions for which the federal government contributes its share pursuant to the Medicaid Act and to continue to provide such funding for so long as it is a participant in the federal Medicaid Program.

IT IS SO ORDERED.